# United States Court of Appeals
## For the First Circuit

No.   03-2429

IN RE STONE & WEBSTER, INC., SECURITIES LITIGATION

ADELE BRODY, on behalf of herself and all others similarly
situated; FRED DUBOIS, JR., individually and on behalf of all
others similarly situated; ALBERT A. BLANK, on behalf of himself
and all others similarly situated; DAVID B. EVERSON, on behalf of
himself and all others similarly situated; FANNY MANDELBAUM, on
behalf of herself and all others similarly situated; MARK HANSON,
on behalf of himself and all others similarly situated,

Plaintiffs,

RAM TRUST SERVICES, INC., LENS INVESTMENT MANAGEMENT LLC,

Plaintiffs, Appellants,

v.

STONE & WEBSTER, INC., H. KERNER SMITH, THOMAS LANGFORD,
PRICEWATERHOUSECOOPERS, LLP,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Boudin, Chief Judge, Leval, Senior Circuit Judge,[*]
and Harrington, Senior District Judge.[**]

---

[*]  Of the Second Circuit, sitting by designation.

[**]  Of the District of Massachusetts, sitting by designation.

Jay A. Eisenhofer, with whom Sidney S. Liebesman, P. Bradford DeLeeuw, Grant & Eisenhofer, P.A., Norman M. Berman, Bryan A. Wood, and Berman, Devalerio, Pease, Tabacco, Burt & Pucillo were on brief for appellant.

Jordan D. Hershman, with whom Inez H. Friedman-Boyce, Anita B. Bapooji, Meredith A. Wilson, and Testa, Hurwitz & Thibeault, LLP were on brief for appellee Smith.

Peter M. Casey, with whom Christian M. Hoffman, Matthew E. Miller, and Foley Hoag LLP were on brief for appellee PricewaterhouseCoopers, LLP.

John D. Donovan, with whom Richard D. Batchelder, Jr. and Ropes & Gray were on brief for appellee Langford.

July 14, 2005

**LEVAL**, <u>Senior Circuit Judge</u>.  This appeal concerns primarily the sufficiency of a complaint alleging securities fraud under the standards of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.  With respect to most of the claims, the United States District Court for the District of Massachusetts granted the defendants' motion to dismiss, based principally on the court's conclusion that the allegations were insufficient to satisfy the PSLRA's required pleading standards.  On the remaining claims, the district court granted summary judgment for defendants and then entered a final judgment.  We affirm the judgment as to some of the claims and vacate as to others.

## I.    Background

The lead plaintiffs, Ram Trust Services, Inc. and Lens Investment Management, LLC, are stockholders of Stone & Webster Inc. ("S&W" or the "Company"), and purport to represent a class of all purchasers of securities of S&W between January 22, 1998, and May 8, 2000.  They brought this consolidated securities-fraud class action against S&W; its chairman, president, and chief executive officer, H. Kerner Smith; its executive vice president and chief financial officer, Thomas Langford; and its auditor, PricewaterhouseCoopers, LLP ("PwC").  The claims against the Company were stayed at the outset because it had filed for protection under the bankruptcy laws.  *See* 11 U.S.C. § 362.  The action proceeded against Smith, Langford, and PwC.

-3-

The very lengthy Amended Complaint (the "Complaint") alleges essentially that S&W, with the complicity of the other defendants, issued fraudulent financial statements and press releases, designed to conceal S&W's rapidly worsening financial condition. It asserts that S&W, a 111-year-old "global leader" in construction, engineering, and consulting services, with consolidated gross revenues in 1999 exceeding $1.2 billion, ¶ 14, began in 1998 to experience rapid deterioration of its financial condition, which Smith and Langford aimed to conceal while they sought a purchaser for the Company. It alleges that PwC also concealed the Company's misleading accounting by making false statements to the effect that S&W's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and that in auditing and certifying S&W's statements, PwC followed Generally Accepted Accounting Standards ("GAAS").

The Complaint's strongest factual allegations fall into three main categories, which will be explored in greater detail below. They are, first, that S&W deliberately underbid on more than a billion dollars of contracts, which at the contract price could be performed only at a loss, and fraudulently reported anticipatory profits on these loss contracts, so as to overstate earnings; second, that S&W fraudulently concealed its loss on a huge contract in Indonesia with Trans Pacific Petrochemical Indotama ("TPPI") by concealing the cancellation of the contract and thus reported

unreceived revenues, inflating the Company's profits or diminishing its losses; and finally, that S&W made public statements, which concealed and misrepresented its shortage of liquid reserves and its impending bankruptcy, as its finances slid into shambles.

Based chiefly on these allegations, the defendants are alleged to have violated § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act" or "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as § 18 of the Exchange Act, 15 U.S.C. § 78r. In addition, Smith and Langford are alleged to have violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as persons in control of S&W.

## II.  Procedural History

In a memorandum and order dated March 28, 2003, the district court dismissed all claims against PwC and nearly all claims against Smith and Langford, finding that the Complaint failed to satisfy the pleading requirements imposed by the PSLRA and Federal Rule of Civil Procedure 9(b) for securities fraud claims. *See In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 136 (D. Mass. 2003).  On August 25, 2003, the district court denied plaintiffs' motion for leave to amend its complaint, on the grounds of undue delay.  *See In re Stone & Webster Inc., Sec. Litig.*, 217 F.R.D. 96 (D. Mass. 2003).  On September 23, 2003, the court granted summary judgment in favor of Smith and Langford as to the remaining claims against them, and on September 24, 2003, entered

final judgment.

## III. Pertinent Elements of Plaintiffs' Claims

The three different statutory bases of the claims under the Exchange Act – § 10(b) and Rule 10b-5 promulgated thereunder ("Rule 10b-5"), § 20(a), and § 18 – rest on slightly different theories and thus have different elements, especially with respect to a plaintiff's need to plead and prove that the defendant acted with a specified state of mind. These differences have a significant effect on this appeal. A summary of the elements of these three claims, to the extent pertinent to this dispute, is as follows.

The Supreme Court has described the "basic elements" of a claim under Rule 10b-5 as including: (1) "a material misrepresentation (or omission)"; (2) "scienter, i.e., a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) "loss causation." *See Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005) (emphasis removed); *see also Wortley v. Camplin*, 333 F.3d 284, 294 (1st Cir. 2003); *Geffon v. Micrion Corp.*, 249 F.3d 29, 34 (1st Cir. 2001). To prove scienter, a plaintiff "must show either that the defendant[] consciously intended to defraud, or that they acted with a high degree of recklessness." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002).

-6-

To succeed on a claim under § 18,[1] that statute appears to require a plaintiff to plead and prove that (i) the defendant made a false or misleading statement, (ii) the statement was contained in a document "filed" pursuant to the Exchange Act or any rule or regulation thereunder, (iii) reliance on the false statement, and (iv) resulting loss to the plaintiff.[2] Under this statute, unlike

---

[1] Section 18 provides, in relevant part:

> Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder . . . which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. . . .

15 U.S.C. § 78r(a).

[2] With respect to the instant case, the district court ruled that under § 18 plaintiffs must show specific reliance on an allegedly misleading statement, and cannot rely on a presumption of fraud on the market as in Rule 10b-5 cases. *See In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d at 135 (citing *Linder Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 56-57 (D. Mass. 1995)); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). No party directly challenges that ruling in this appeal, and so we have no reason to review it here. The district court also read the Complaint as alleging reliance only by the named plaintiffs and failing to allege reliance by the class plaintiffs, thus permitting only the named plaintiffs to pursue § 18 claims. *See In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d at 135. We are skeptical of this reading of the Complaint, especially given the obligation to construe the Complaint in the light most favorable to plaintiffs. However, we refrain from expressing

Rule 10b-5, a plaintiff bears no burden of proving that the defendant acted with any particular state of mind. *See Magna Invest. Corp. v. John Does One Through Two Hundred*, 931 F.2d 38, 39-40 (11th Cir. 1991). The state of mind with which the defendant acted enters the case instead as a defense. The statute provides that the defendant can rebut liability by proving "that he acted in good faith and had no knowledge that such statement was false or misleading. . . ." *See* 15 U.S.C. § 78r(a).

Section 20(a) asserts the liability of persons exercising control for violations of law by a controlled entity.[3] Smith and Langford are alleged to have exercised control over S&W, and

_____

further views, as this finding by the district court was not directly raised as part of the appeal, and we anticipate that it will be subject to litigation on remand.

In addition, as among the array of documents alleged by plaintiffs in their Complaint to contain false statements, only the statements made in S&W's annual ("10-K") filings with the Securities and Exchange Commission ("SEC") are deemed "filed" for the purposes of § 18. Again, the district court so ruled, *id.*, and no party challenges that determination in this appeal.

[3] Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. 78t(a).

therefore to share liability for S&W's violations of Rule 10b-5. The elements of § 20(a) are generally stated to be (i) an underlying violation of the same chapter of the securities laws by the controlled entity, here S&W; and (ii) control of the primary violator by the defendant. *See* 15 U.S.C. § 78t(a)*; see also Aldridge,* 284 F.3d at 84-85.

As with § 18, and once again unlike Rule 10b-5, § 20(a) does not on its face obligate the plaintiff to plead or prove scienter (or any other state of mind) on the part of the controlling persons named as a defendant.[4] Instead, the burden is shifted. The defendant can rebut liability by proving that he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *See* 15 U.S.C. § 78t(a).

## IV.  Standards Imposed by the PSLRA and Rule 9(b)

Three provisions of the PSLRA are of significance for this appeal. The first is a pleading requirement, which specifies that

---

[4] Some courts have indicated that the plaintiff must prove "culpable participation" on the part of the controlling person. *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (citing *Gordon v. Burr*, 506 F.2d 1080, 1085 (2d Cir. 1974)); *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975). This Circuit has taken no position on the question. *See Aldridge*, 284 F.3d at 85. The district court in the instant case did not rule on the question, *see In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d at 135, and the parties did not brief it. We therefore again take no position in this decision on whether "culpable participation" is required, or on what it means.

a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).[5] In the body of this opinion, we will refer to this provision of § 78u-4(b)(1) as the PSLRA's "clarity-and-basis" requirement. There is no dispute that it applies to every claim alleged in the Complaint.

We have explained previously that to satisfy this provision, a complaint "must provide factual support for the claim that the statements or omissions were fraudulent, that is, facts that show exactly why the statements or omissions were misleading." *Aldridge*, 284 F.3d at 78; *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193-94 (1st Cir. 1999). The plaintiff need not,

---

[5] The full text of this provision reads:

In any private action arising under this chapter in which the plaintiff alleges that the defendant--
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

however, go so far as to "plead evidence." *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002).

The PSLRA's clarity-and-basis requirement is closely related to the requirement of Federal Rule of Civil Procedure 9(b) that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." We have observed that the PSLRA's pleading standard is "congruent and consistent" with pre-existing Rule 9(b) pleading standards in this Circuit. *See Greebel,* 194 F.3d at 193.

The second relevant PSLRA provision, also a pleading requirement, provides,

> in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). We have interpreted this provision as demanding a recitation of facts supporting a "highly likely" inference that the defendant acted with the required state of mind. *Aldridge*, 284 F.3d at 82. We have explained, that "[u]nder the PSLRA, the complaint must state with particularity facts that give rise to a 'strong inference' of [the required state of mind], rather than merely a reasonable inference. . . . The inference . . . must be reasonable and strong, but need not be irrefutable." *In re Cabletron Systems, Inc.*, 311 F.3d at 38 (quoting 15 U.S.C. §

-11-

78u-4(b)(2)); *see also Aldridge*, 284 F.3d at 82.  In this opinion, we will refer to this provision of §78u-4(b)(2) as the "strong-inference" requirement of the PSLRA.

In addition to these two pleading requirements, the PSLRA also carves out a statutory safe-harbor for many "forward-looking" statements.  *See* 15 U.S.C. § 78u-5.  "Forward-looking" statements are, generally speaking, statements that speak predictively of the future.  *See* 15 U.S.C. § 78u-5(i)(1) (defining "forward-looking statement").  Under the safe harbor provisions, fraudulent forward-looking statements cannot give rise to liability in certain circumstances, including where the statement at issue is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  *See* 15 U.S.C. § 78u-5(c)(1).

The clarity-and-basis requirement of the PSLRA and its limited safe harbor for forward-looking statements seem to apply equally to claims under Rule 10b-5, § 18, and § 20(a).  However, because Rule 10b-5, § 18, and § 20(a) differ as to whether the plaintiff must prove that the defendant acted with a particular state of mind, the PSLRA's strong-inference requirement applies differently as among the three theories.

By the terms of the PSLRA, the strong-inference requirement applies only to private actions "in which the plaintiff may recover

-12-

money damages only on proof that the defendant acted with a particular state of mind." A claim under Rule 10b-5 falls within those parameters. Under 10b-5 the plaintiff must prove that the defendant acted with scienter. Thus, the PSLRA requires that the Complaint allege with particularity facts giving rise to a strong inference of scienter. In contrast, §§ 18 and 20(a) do not, at least on their face, require that the plaintiff prove that the defendant acted with any particular state of mind. The strong-inference requirement of the PSLRA therefore has no application to claims under these statutes.[6]

## V. Applicable Accounting Standards

Before turning to the precise allegations of the Complaint, we

---

[6] As noted above in footnote four, this Circuit has taken no position on the question whether a plaintiff must prove "culpable participation" on the part of the defendant in order to prevail under § 20(a). *See Aldridge*, 284 F.3d at 85. "Culpable participation" would seem to imply a culpable state of mind. If that is an element of a claim under § 20(a), the PSLRA's strong-inference requirement would appear to apply, as well.

Because defendants have not argued on appeal that "culpable participation" in an element of plaintiffs' case under § 20(a), we will assume throughout this opinion that it is not an element and that the strong-inference requirement of the PSLRA accordingly has no application to a claim under § 20(a). It is not our intention, however, to foreclose that question. As we are remanding several claims under § 20(a), we leave it to the district court to determine, in the first instance, if the issue is raised, whether "culpable participation" applies. Should the district court determine that "culpable participation" is an element of a claim under § 20(a) and that the strong-inference requirement of the PSLRA therefore applies, this may require the dismissal of claims we have remanded. Because of the commonality of elements of claims under §§ 20(a) and 18, rulings one way or another in the district court as to § 18 may well moot the question whether § 20(a) requires "culpable participation."

pause to discuss briefly certain accounting standards for long-term construction contracts, which are integral to an understanding of the Complaint.

Long-term construction contracts can characteristically involve early periods during which the contractor's expenditures far exceed its revenues and later periods during which its revenues far exceed expenditures. Depending how the revenues and expenditures are accounted for, the profit and loss statements of contractors engaged in such long-term construction projects might present the appearance of drastic gyrations, beginning with large losses and later shifting to large profits, even though on a sophisticated analysis, the company's experience would reflect a predictable, orderly progress toward a predictable result.

To counteract such misleading appearances of unpredictable gyrations, and present a more realistic picture of the stability of operating results, the accounting profession has developed, as part of GAAP, two accounting methods designed in proper circumstances to smooth out the reported operating results of such businesses. The Complaint points to, and quotes extensively from, three accounting documents, which provide guidance: American Institute of Certified Public Accountants Statement of Position 81-1: Accounting for Performance of Construction-Type and Certain Production-Type Contracts (1981) ("SOP 81-1"), *see* ¶ 40, Accounting Research Bulletin 45: Long-Term Construction-Type Contracts (1955) ("ARB

45"), *see id.*, and Financial Accounting Standards Board Statement of Financial Accounting Standards No. 5 ("FAS 5"), *see, e.g.,* ¶¶ 44, 76.

According to SOP 81-1 and ARB 45, as we understand them, the most favored method for a contractor to account for long-term construction contracts, *in appropriate circumstances*, is "percentage-of-completion" accounting. Under this approach, the contractor recognizes revenues expected to be received in the future, as well as net profits expected to be realized, as work on a contract progresses, notwithstanding that the contractor may not yet have received payment. In appropriate circumstances, this accounting method is thought to best reflect the actual "economic substance" of a contractor's transactions and therefore to be preferable. SOP 81-1 ¶¶ .22, .25. Under percentage-of-completion accounting, generally speaking, regardless of whether revenues have been received, a company recognizes as current revenue on its profit and loss statement that percentage of total expected revenue, which reflects the percentage that the costs incurred in the period bear to total estimated costs on the project. ARB 45 ¶ 4. Various conditions must be present to justify the use of this method, such as the expectation that the buyer will satisfy its obligations under the contract, and "the ability to make reasonably dependable estimates," including "estimates of the extent of progress toward completion, contract revenues, and contract costs."

SOP 81-1 ¶ .23. The current recognition of expected future profit, furthermore, presupposes that the contract be expected to yield a profit. *See id.* ¶¶ .25, .85.

The second generally accepted method of accounting for such contracts is called the completed-contract method. *See generally id.* ¶¶ .04, .30-.33. Under this method, "income is recognized only when a contract is completed or substantially completed." *Id*. ¶ .30. Until that point, for the duration of contract performance, "billings and costs are accumulated on the balance sheet, but no profit or income is recorded." *Id*. The completed-contract method is viewed as preferable when reasonably dependable estimates cannot be made or "inherent hazards" relating to contract conditions make profit predictions unreliable. *See id*. ¶ .32. A recognized weakness of the completed-contract method is that it "does not reflect current performance when the period of a contract extends beyond one accounting period," and "may result in irregular recognition of income." *See id*. ¶ .30.

Third, in circumstances where "estimating the final outcome may be impractical except to assure that no loss will be incurred," percentage-of-completion accounting, with a zero estimate of profit, may be utilized. *See id*. ¶ .25. In doing so, a company recognizes revenues (even though not yet received) equal to its costs incurred in the period "until results can be estimated more precisely." *Id*.

This zero-profit-margin approach resembles the completed-contract method in some respects and resembles percentage-of-completion in others. The similarity to completed-contract lies in the fact that, under both methods, no estimated future profit is recognized on a current basis as the job progresses. Profit is recognized only upon substantial completion. Its greater resemblance to percentage-of-completion lies in the fact that current costs, matched by equal amounts of anticipated revenue, are recognized in the current profit and loss statement, while under the completed-contract method, neither costs nor revenues from the project are reflected in the current profit and loss statement until substantial completion of the project.[7] *See id*. ¶ .33. Thus, the zero-profit-margin approach provides an indication in the income statement of the "volume of a company's business" activity while the completed-contract approach does not. *Id.*

Regardless of the method employed, however, anticipated losses are accounted for differently from anticipated profits. "[W]hen

---

[7] SOP 81-1 states:

Under the zero profit margin approach to applying the percentage-of-completion method, equal amounts of revenue and cost, measured on the basis of performance during the period, are presented in the income statement; whereas, under the completed-contract method, performance for a period is not reflected in the income statement, and no amount is presented in the income statement until the contract is completed.

SOP 81-1 ¶ .33.

-17-

the current estimates of total contract revenue and contract cost indicate a loss, a provision for the entire loss on the contract should be made." *Id*. ¶ .85; *see also* ARB 45 ¶¶ 6, 11. Such provision for losses should be made "in the period in which they become evident." SOP 81-1 ¶ .85.

The full amount of a "probable" loss should be taken as a charge against income if the amount of the loss "can be reasonably estimated," according to FAS 5. *See* FAS 5 ¶ 8. If the amount of the loss cannot be reasonably estimated, "disclosure of the contingency shall [instead] be made . . . indicat[ing] the nature of the contingency and . . . giv[ing] an estimate of the possible loss or range of loss" where possible. *Id.* ¶ 10. Likewise, if there is only a "reasonable possibility" of a loss instead of a "probable" loss, disclosure instead of accrual is appropriate. *Id*. "Probable" is defined by FAS 5 to mean "likely to occur." *Id.* ¶ 3.

**VI. Discussion**

A. *Allegations of the Complaint as to Smith and Langford*

Against this background of pertinent legal rules and accounting principles, we turn to the central allegations in the Complaint, which as noted earlier, can be grouped into three general categories.

1. <u>Underbid Projects</u>

The first category of plaintiffs' claims principally relates to the allegation that S&W underbid various projects and

fraudulently reported expected profits from these projects when, in fact, the projects were expected to produce losses. The district court dismissed all of these claims on the ground that the pleading failed to satisfy the PSLRA's requirement of clarity and basis. We conclude that at least with respect to some of the claims, the clarity-and-basis requirement was satisfied.

(a) <u>PSLRA's requirement of clarity and basis</u>. In our view, this pleading is not the kind of vague prelude to a fishing expedition that Congress sought to bar by imposing the clarity-and-basis requirement of the PSLRA. Citing sources within the company, the Complaint alleges that S&W developed a strategy of bidding a number of projects at a loss. ¶¶ 52-53. The Complaint expressly names ten contracts, aggregating over $1.4 billion, which allegedly were underbid by margins between 10% and 40% and were expected to produce losses. ¶¶ 58-61. The Complaint alleges that the Company accounted for these projects using percentage-of-completion accounting, recognizing a proration of anticipated future profits in the current profit and loss statements, notwithstanding that losses, rather than profits, were expected to result from these contracts. ¶¶ 43, 47, 168. The Complaint refers to SOP 81-1, which forbids the use of the percentage-of-completion method to prorate anticipated future profits into current operating results unless future profits are in fact anticipated, *see* SOP 81-1 ¶¶ .24-.25, as well as FAS 5, which requires immediate recognition of

-19-

expected losses, as soon as they are anticipated, *see* FAS 5 ¶ 8; SOP 81-1, ¶¶ .24, .85.  The Complaint identifies with precision statements alleged to be false, including S&W's periodic current earnings figures in its sequential profit and loss statements during the period of the alleged fraud.

With respect to clarity, the Complaint sets forth a clear and precise statement of what the alleged fraud consisted of.  With respect to basis, while the sources of information on which the Complaint relies for these allegations are not overwhelmingly impressive, they include sources within the Company who might well have access to the kind of information for which they are cited.  Furthermore, the allegations are not merely conclusory, but are rather supported by details that provide factual support for plaintiffs' allegations of fraud.

We find that these pleadings complied sufficiently with PSLRA's requirement of clarity and basis, as well as with the preexisting requirements of Rule 9(b).  *See* Fed. R. Civ. P. 9(b).  We have previously stated that PSLRA does not require the plaintiff to "plead evidence."  *See In re Cabletron Systems, Inc.*, 311 F.3d at 33.  As we understand, it was not Congress's intention to bar all suits as to which the plaintiff could not yet prove a *prima facie* case at the time of the complaint, but rather to prevent suits based on a guess that fraud may be found, without reasonable basis or a clear understanding as to what the fraud consisted of,

-20-

but in the hope of finding something in the course of discovery. *Cf. In re Cabletron Systems, Inc.*, 311 F.3d at 30 (observing that the "statute was designed to erect barriers to frivolous strike suits, but not to make meritorious claims impossible to bring").

To the extent that the district court dismissed these claims on the grounds that they failed to satisfy the clarity-and-basis requirement of PSLRA, we respectfully disagree. It does not necessarily follow, however, that the dismissal of all of those claims should be vacated. We believe some of the claims relating to the underbidding of contracts were fatally flawed for other reasons and thus affirm the dismissal as to some of them.

(b) <u>Strong inference of scienter</u>. As noted, the PSLRA imposes an additional hurdle: The Complaint must allege facts supporting a strong inference of whatever state of mind on the part of the defendant must be proved as an element of the claim.

(i) <u>Claims under 10b-5</u>. To the extent these claims are asserted under Rule 10b-5, the plaintiffs must prove that the defendants acted with scienter in order to establish their right of recovery. Accordingly, under the PSLRA, the Complaint must state with particularity facts giving rise to a strong inference that the defendants acted with either knowing, intentional falsity or reckless disregard for the truthfulness of the statements.

We find the Complaint deficient in this respect. First, the Complaint provides nothing supporting the inference that either

-21-

Smith or Langford was directly involved in the detailed accounting for these ten particular contracts, or had knowledge of the alleged falsity. One could draw the inference that Langford, as the Chief Financial Officer, had some supervisory involvement with the accounting. But no strong inference necessarily follows that the Chief Financial Officer, much less the Chief Executive Officer, was aware of the improper proration of future profits on any particular underbid contract.

This weakness is accentuated by another. The larger the distortion of the company's accounting figures, the more likely it might be that such distortion could not be accomplished without either complicity, or reckless irresponsibility, of top officers. The Complaint, however, gives no indication whatsoever what the size of the alleged overstatement of current profits was. Such an overstatement, in the circumstances alleged, would result primarily from two variables – the size of the expected future loss which should have been taken as a charge against current earnings, *see* FAS 5 ¶ 8, and the size of the improperly anticipated future profits prorated into the current profit and loss statement. The Complaint says nothing of the size of either component.

Indeed, the Complaint at times does not even assert that a loss was expected from these underbid contracts. Its description of the "underbidding policy" asserts that Smith planned the "selling [of] fixed-price jobs *either at a loss or with such small*

*margin for error* that the slightest adverse change in a project's economics would cause S&W to lose money on the job." ¶ 53 (emphasis added). According to this description, the contracts were bid near the expected break-even point, or with the expectation of a small and unreliable profit, rather than with expectation of a loss.

We recognize that in assessing a motion to dismiss for insufficient pleading, we must read the Complaint in the manner most favorable to the plaintiff, drawing reasonable inferences in the plaintiff's favor, *see Aldridge*, 284 F.3d at 79, and that inconsistent pleading does not deprive the pleader of the right to have the complaint read, as between the inconsistencies, in the manner that supports the adequacy of the pleading. The PSLRA's strong-inference requirement does not change this rule.[8] Because

---

[8] One difficulty we find with the district court's decision is that in several instances, in ruling on defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court failed to read the Complaint in the light most favorable to the plaintiff and failed to give the plaintiff the benefit of inferences that could reasonably be drawn. For example, where the court found "internal inconsisten[cies]" in the allegations, it concluded that the conflicting allegations "undermine[d] the sufficiency of [the] claim." *See In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d at 120-21.

A plaintiff has the right to plead in the alternative, and the plaintiff's doing so does not undermine the validity of the complaint. The stronger of the conflicting allegations must be accepted as if the conflicting alternative allegation had not been included. Nor is this changed by the PSLRA's strong-inference requirement. In assessing whether the pleading satisfies the strong-inference requirement, a court must draw all reasonable inferences in the plaintiff's favor, and then weigh whether they satisfy the statutorily mandated "strong inference." *See Aldridge*,

the Complaint elsewhere asserts that the ten projects were bid "at a loss," ¶ 58, we credit the Complaint as asserting that the projects were indeed bid at a loss, rather than at the break-even point or at a slight profit. Nonetheless, the Complaint in no way suggests that the losses anticipated from these contracts were large.

At one point, the Complaint asserts that "[a]ccording to . . . former S&W insiders, S&W's underbidding [of those contracts] ranged from 10% to 40%." ¶ 61. But it says nothing about how much loss would be expected to result from underbidding by 10% to 40%. That would depend on the anticipated profit margins of a normal bid, not affected by the underbidding strategy, and the Complaint includes no allegation about that. Nor does the Complaint allege what percentage of the Company's net operating figures were attributable to the ten contracts.

In short, the Complaint tells no more than that, in the accounting for ten contracts, a profit of unspecified size was recognized in current earnings when, according to GAAP principles, those contracts should have been booked either as a loss of unspecified size or using a zero-profit-margin assumption coupled with a note describing a loss contingency. As anything above the break-even point represents profit, and anything below the break-even point represents loss, the difference between profit and loss

_____

284 F.3d at 78; *Greebel*, 194 F.3d at 201.

can on a particular contract be tiny. Nothing in the Complaint suggests that correct accounting for these contracts would have involved significantly different overall numbers from those produced by the allegedly incorrect accounting. And if the accounting for those contracts had no significant effect on the Company's overall results, there is little reason to assume that the Company's CEO and CFO must have known about the failure to follow accepted accounting practices. Irregular financial statements which overstate estimated results to only a small degree do not support a strong inference that the Chief Executive Office or the Chief Financial Officer of the company acted with intent to defraud, or with reckless disregard for the truth of the statements.

A third significant weakness in the alleged basis of scienter is that in such accounting, the question whether to recognize profit or loss depends not on concrete facts but an *estimation or prediction* of whether in the end the project will net a profit or a loss. The Complaint fails to allege particularized facts supporting the inference that a reasonable assessment of the facts relating to those underbid contracts could support a prediction only of loss.[9]

---

[9] In addition, we agree with the district court that Smith and Langford's change-in-control agreements did not provide a strong motive to engage in fraud. *See In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d at 127-28.

Accordingly, we determine that the claims of fraud for improper proration of future profits on these ten allegedly underbid contracts, to the extent asserted under Rule 10b-5, as to which "the plaintiff may recover money damages only on proof that the defendant acted with [scienter]," fail the requirement of the PSLRA that "the complaint . . . state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(2). As to those 10b-5 claims, we affirm the judgment of the district court dismissing them.

We reach a different result, however, where those claims are asserted under §§ 20(a) and 18.

(ii) <u>Claims under §§ 20(a) and 18</u>. As explained above, the PSLRA's strong-inference requirement does not apply to claims under § 20(a), because this statute does not require proof of the defendant's state of mind.[10]

We recognize that a plaintiff must show under § 20(a) that the controlled entity committed a violation of the securities laws. If that violation was, for example, a violation of Rule 10b-5, which requires a proof of scienter, then the plaintiff under § 20(a) must prove that the controlled entity acted with "a particular state of mind." Nonetheless, if the statute is read literally, the strong-inference requirement of the PSLRA does not apply. The statute states that the strong-inference requirement applies only where the

---

[10] See, though, *supra* note 6.

plaintiff's recovery depends on proof that "*the defendant* acted with a particular state of mind" (emphasis added). *See* 15 U.S.C. § 78u-4(b)(2). The obligation to prove that the controlled corporation acted with scienter does not involve an obligation to prove "that *the defendant* acted with a particular state of mind."[11]

Section 18 similarly imposes no burden on plaintiff to prove the defendant's state of mind, shifting the burden to the defendant to show "that he acted in good faith and had no knowledge that such statement was false or misleading." *See* 15 U.S.C. § 78r(a). Accordingly, the strong-inference requirement of the PSLRA has no application to § 18.

With respect to the claims under §§ 20(a) and 18 based on improper recognition of anticipated profits on underbid contracts, (1) we reject the reasons given by the district court for dismissing these claims, and (2) we conclude that the reasons which support our order of dismissal of the similar claim under Rule 10b-5 have no application to these claims. Accordingly we vacate the judgment dismissing them. As to whether one or both of those claims is subject to possible dismissal for other reasons, we

---

[11] We recognize that this plain language reading of the PSLRA allows the secondary liability claims to go forward where claims of primary liability have been dismissed. There may be policy arguments counseling for a broader reading of the PSLRA. As to this case, however, such arguments have not been made and we therefore do not consider them. For purposes of this case, we read the PSLRA as written, leaving the question whether the statute should be interpreted more broadly to be addressed if and when such argument is advanced.

express no view.  We remand the claims under §§ 20(a) and 18 to the district court for whatever further proceedings are appropriate.

(c) <u>Backlog.</u>  In addition to alleging that the policy of underbidding resulted in materially overstated earnings, the Complaint also alleges that it was misleading of defendants to include the underbid contracts in S&W's "backlog."  *See, e.g.,* ¶¶ 228, 248-49, 251, 254, 284, 313-15.  As to these claims, brought under Rule 10b-5, § 20(a), and § 18, we sustain the district court's dismissal.  Plaintiffs have simply failed to plead a false statement with respect to the "backlog" allegations, and so their claims must be dismissed under Federal Rule of Civil Procedure 12(b)(6).  As defined by the Complaint, S&W's backlog consisted of "the accumulated amount of the Company's committed, but unexpended, contractual work."  ¶ 38.  These contracts represented "committed, but unexpended, contractual work."  The statements resulting from the inclusion of the contracts in the backlog were neither false nor misleading.

## 2.  The TPPI Project and "Phantom Revenue"

The second group of claims of fraud relates to the TPPI contract for construction in Indonesia, which was ultimately cancelled for lack of funding.  The Complaint alleges that S&W, with the knowledge of Smith and Langford, reported expected future payments as current revenues, even though the project was indefinitely suspended and defendants knew it was unlikely to ever

-28-

be resumed.  The Complaint alleges that S&W overstated its current revenues and concealed an expected loss, which according to GAAP principles should have been recognized.

The allegations are essentially as follows:  In 1996, TPPI awarded to S&W a $710-million contract in connection with the construction of a $2.3-billion chemical complex in Indonesia.  ¶ 63.  S&W procured and transported to Indonesia approximately $332 million worth of materials and equipment to perform the project. ¶ 64.  Under its agreements, S&W assumed responsibility for cancellation costs with respect to equipment purchase orders and subcontract work.  ¶¶ 64-65.

In 1997, TPPI suspended work on the project because its funding arrangements were exhausted.  ¶ 65.  The Complaint alleges that "TPPI suggested to S&W [in 1997] that it try to get out of its contracts with its vendors due to the suspension."  *Id*.  By August 1998, S&W obtained permission from TPPI to resell project materials and equipment, and it began selling equipment, according to Daniel Martino, a former senior accountant at S&W, "for pennies on the dollar."  ¶¶ 58, 73.

By January 1999, "it was clear that the project would not restart," and "TPPI had told S&W that the slight prospect that had existed during 1998 that they would find an investor to fund the project had fallen through."  ¶ 74.  In January 1999, a special meeting of the Company's Board of Directors was held to discuss

TPPI, and by the end of the meeting "it was evident to the Board that the TPPI project had already caused S&W serious financial problems and that it was unlikely the project would ever restart." ¶ 77.

The Complaint asserts that because the Company had incurred substantial costs without corresponding revenue, the suspension of the project

> should have had a significant negative effect on S&W's financial statements. According to CS-1 [an informant who had been an assistant comptroller at S&W], to avoid that negative effect, beginning with the first quarter of 1998, S&W created phantom revenue and receivables from the TPPI project to cover S&W's project related costs by recording revenue equal to the amount of those costs.

¶ 67. S&W booked $86.9 million of such "phantom revenue" in connection with TPPI in 1998 and $53 million in 1999. ¶ 68. The use of this allegedly fraudulent accounting changed the Company's results in 1998 from a loss of $108.7 million to a reported loss of $49.3 million, and in 1999 from a loss of $11.3 million to reported net income of $20.5 million. *Id.* Furthermore, because S&W knew the project was cancelled, it was obligated under FAS 5 to immediately recognize the entire expected loss either as a charge or as a loss contingency. *See* ¶ 76.

While the notes to the financial statements did refer to a loss contingency based on TPPI, the Complaint alleges that the references were false in two respects. First, the notes stated that the Company "believes it unlikely that the project will be

cancelled," or otherwise gave the impression of a likely restart, *see* ¶¶ 209, 224, 296, while the apparent circumstances showed it was highly likely the contract would be cancelled. Second, the amount of the loss estimated to result from the cancellation was substantially understated given the immense investment the Company had made in the TPPI project and the high probability the entire investment would be lost if TPPI failed to reinstate the project.

In substance, the Complaint describes two separate, though related, accounting abuses in violation of GAAP principles: First, it alleges the overstatement of revenues ("phantom revenues") and concealment of loss by inappropriate use of percentage-of-completion accounting (assuming a zero-profit margin) to report current revenues not yet received, when the buyer could not "be expected to satisfy [its] obligations under the contract." *See* SOP 81-1 ¶ .23. The offsetting of the actual current losses with projected revenues that were not expected ever to be received allegedly concealed large current losses on the project. Second, the Complaint alleges concealment of an expected loss by failure to acknowledge it appropriately, either as a charge to income, or as an accurately described loss contingency. *See* FAS 5 ¶¶ 8, 10. The Complaint alleges that as a result of these accounting decisions, S&W's financial results published in the Company's 10-K and 10-Q filings, as well as in other public announcements, were materially overstated.

In addition, the Complaint alleges that S&W misled investors by carrying the TPPI project in its backlog, *see, e.g.*, ¶ 221, failing to acknowledge that the project was terminated or at least unlikely to restart, *see, e.g.*, ¶¶ 166, 193, 209, 217, 224, 296, and reporting a materially understated estimate of the Company's losses when disclosing the "charge" S&W would take in the event the project were to be cancelled, *see, e.g.*, ¶¶ 209, 224, 296.

(a) <u>The PSLRA's requirement of clarity and basis.</u>  In our view, the allegations of exaggerated revenues and failure to report an expected loss are sufficiently detailed and supported to satisfy the PSLRA's clarity-and-basis requirement.

These allegations are quite detailed and clear in setting forth what are the allegedly false and misleading statements and in explaining why they are false and misleading.  The GAAP documents cited by the Complaint specify that the propriety of reporting unreceived payments as current revenue, matched with currently incurred costs, depends on a reasonable expectation that the buyer will satisfy the obligation to make the payments.  *See* SOP 81-1 ¶ .23.  The Complaint adequately explains that in these circumstances, TPPI, which had lost its source of funding and had indefinitely suspended all work on the project, could not be expected to satisfy its contractual obligation to make payment.

It also seems clear from the GAAP documents that as soon as "current estimates of total contract revenue and contract cost

indicate a loss, a provision for the entire loss on the contract should be made." *See* SOP 81-1 ¶ .85; *see also* ARB 45 ¶¶ 6, 11. A probable loss should be "accrued by a charge to income" when "the amount of loss can be reasonably estimated." FAS 5 ¶ 8. A "reasonable possibility" of loss should be properly described and declared as a loss contingency. *Id.* ¶ 10. The Complaint clearly states its theory that TPPI's expected failure to pay would result in very substantial losses to S&W, which it did not take as a charge against earnings. To the extent the probable loss is described in the contingency notes of S&W's statements, the Complaint alleges with clarity that the notes are misleading in describing the possibility that TPPI might cancel as "unlikely," ¶ 209, and in understating the size of the loss that would result in the event of that contingency. Furthermore, drawing all reasonable inferences in plaintiffs' favor, the Complaint adequately asserts that the amount of loss could have been reasonably estimated.

We find that, as in *Aldridge*, 284 F.3d at 82, and *In re Cabletron Systems, Inc.*, 311 F.3d at 39, these allegations are sufficiently detailed and clear to satisfy the clarity-and-basis requirements of the PSLRA and Rule 9(b).

On the other hand, claims of fraud based on the mere inclusion of the TPPI contract in S&W's "backlog" must be dismissed. We affirm the district court's dismissal of these aspects of the Complaint for substantially the same reasons in our discussion of

-33-

the inclusion of the allegedly underbid contracts in the backlog. As defined by the Complaint, S&W's backlog consisted of "the accumulated amount of the Company's committed, but unexpended, contractual work." ¶ 38. Even if the TPPI project was unlikely to restart, it still constituted, under the terms of the Complaint, "committed, but unexpended, contractual work." S&W's statements as to backlog cannot be considered false or misleading just because they included the TPPI contract. Thus, these statements cannot give rise to liability under Rule 10b-5, § 20(a), or § 18.

(b) <u>Strong inference of scienter.</u> As noted above, where the plaintiff's recovery depends on proof that the defendant acted with a particular state of mind, the Complaint must set forth facts giving rise to a "strong inference" that the defendants acted with the required state of mind. *See* 15 U.S.C. § 78u-4(b)(2).

(i) <u>Claims under 10b-5.</u> The claims relating to TPPI, to the extent pleaded under 10b-5, must be supported by facts giving rise to a strong inference of scienter. We find that the allegations as to Smith and Langford's involvement with TPPI fail that test.

The principal theory of the Complaint as to TPPI is that defendants reported "phantom revenue" and failed to make appropriate disclosure of an expected loss. Even drawing all reasonable inferences in plaintiffs' favor, as we must, the Complaint fails to support a "strong inference" of scienter as to

Smith and Langford. The factual allegations, which satisfy the clarity-and-basis requirements as to the use of misleading accounting, lack sufficiently compelling and clear factual allegations concerning the culpable involvement of Smith and Langford to support a "strong inference" of scienter on their part.

Despite the Complaint's rhetorical flourish, accusing defendants of reporting "phantom revenue," the booking of revenues before their receipt does not necessarily involve any impropriety whatsoever. As described earlier, such anticipatory booking of revenues is integral to percentage-of-completion accounting (including with a zero-profit margin), according to the GAAP documents plaintiffs cite in the Complaint. In fact, for construction businesses engaged in S&W's type of work, such percentage-of-completion accounting with anticipatory recognition of revenue is described as "preferable in most circumstances." *See* SOP 81-1 ¶ .25. The question raised by the Complaint is the more subtle one of whether *in the particular circumstances presented* it was appropriate to use percentage-of-completion accounting, which depended primarily on whether the purchaser of S&W's services (TPPI) was expected to fulfill its obligations.

Thus, the allegations of scienter concerning both the reporting of "phantom revenue" from the TPPI project and the failure to reflect the expected loss depend largely on whether the Complaint alleges facts supporting a strong inference that Smith

and Langford did not expect TPPI to fulfill its commitments. The Complaint speaks vaguely of communications from TPPI to S&W expressing doubt as to TPPI's resumption of the project and suggesting that S&W get out of its contracts with vendors. These allegations are simply too vague to support a strong inference that Smith and Langford were aware of them or, if so, were reckless in failing to take them seriously.

Again, without attribution, the Complaint alleges that S&W obtained TPPI's permission to sell project materials. A former senior accountant is quoted for the proposition that the materials were sold "for pennies on the dollar." This allegation is too sketchy and vague. There is no indication how broadly materials were sold or that senior management was aware of the circumstances.

We recognize the Complaint alleges that Smith and Langford knew the equipment sent to Indonesia for the project was being sold for pennies on the dollar and that the project would not be restarted. ¶ 75. It also alleges that "it was evident to the Board [of Directors] . . . that it was unlikely the project would ever restart." ¶ 77. Such conclusory allegations as to the existence of knowledge are insufficient to provide the factual basis, supporting a strong inference of scienter, required by the PSLRA. They are simply conclusory assertions of the facts for which a showing supporting a strong inference of scienter must be pleaded. Where the state of mind in question is the defendant's

knowledge of the fraudulent nature of the Company's financial reports, and the PSLRA requires that facts be stated with particularity giving rise to a strong inference that the defendant acted with that state of mind, the requirement is not satisfied by a pleading which simply asserts that the defendant knew of the falsity.

We therefore affirm the district court's dismissal of the claims regarding TPPI brought under Rule 10b-5 against Smith and Langford.

(ii) <u>Claims under §§ 20(a) and 18.</u> Our rulings on the claims brought under §§ 20(a) and 18 with respect to TPPI mirror our treatment of the claims brought under §§ 20(a) and 18 with respect to the alleged policy of underbidding. Because the PSLRA's strong-inference requirement does not apply to the claims brought under §§ 20(a)[12] and 18, (1) we reject the reasons given by the district court for dismissing the claims, and (2) note that the reasons which support our order of dismissal of the similar claim under Rule 10b-5 have no application to these claims. Accordingly, we vacate the judgment dismissing them. We remand these claims to the district court for whatever further proceedings are appropriate.

---

[12] See, though, *supra* note 6.

3. <u>Concealment of Illiquidity, Inability to Pay Debts, and Impending Bankruptcy</u>

The Complaint's final major area of focus is on statements allegedly concealing S&W's financial deterioration. The Complaint contends that S&W issued false and misleading statements reassuring investors of S&W's financial viability and its access to sufficient cash to meet its needs, even as its finances fell into shambles, and eventually into bankruptcy.

The allegations of financial deterioration are set forth in the Complaint at length and with specificity. According to a former controller for S&W's industrial division, by the middle of 1998, "S&W knew that the Company was 'starting to get strapped for cash.'" ¶ 70. The Company began having problems paying its vendors on the Tiverton project in the summer of 1998, leading some unpaid vendors to stop delivering materials to the project site. ¶ 71. Meanwhile, throughout 1998,

> comprehensive internal financial reports, distributed to approximately twenty S&W division heads and top executives, that included financials broken out for all divisions, with details of personnel costs, sales, income and working capital and which also measured S&W's performance against its plan for the year, showed a materially worse financial situation and outlook [than the disclosed financial results].

¶ 72. A confidential source, identified as the "head of S&W's Development Corporation" said:

> Anyone who had access to the monthly financials could see that it was not what was being said publicly. You could read them and compare them with the quarterlies he

[Smith] was reporting and ask what he was smoking. Knowing what we knew inside and seeing the quarterlies — they just did not jibe.

*Id.*

The financial problems continued to mount through 1999. Unpaid vendors threatened to place liens on the Tiverton project, ¶ 78; the Company began using credit cards to purchase materials for the project, ¶ 79; the Company faced calls seeking payment on various projects, ¶ 83; the Company's "treasurer regularly sent e-mails to internal staff advising that the Company had no money to pay the vendors' bills and to not bother submitting requests for payment," *id.*; and the Company found that it was increasingly difficult to get vendors to bid on S&W projects, ¶ 84. Some vendors and subcontractors called Smith directly to complain about not being paid, and "those who called Smith regularly to collect money and threaten to walk off a project were usually the first to get paid." ¶ 85.

By summer of 1999, a list of overdue accounts payable was created and regularly delivered to Smith, Langford, and S&W's comptroller. ¶ 87. Some accounts payable were 600-700 days overdue, and consequently vendors and subcontractors were stopping work, engaging in slow-downs, or filing liens. *Id.* The Company succeeded in obtaining a credit agreement in July 1999, but was already in material default by the time the agreement was made because of the failure to pay vendors and subcontractors as

-39-

required.  ¶ 92.

In October, needing cash to placate lenders, S&W announced it was selling its headquarters building and cold storage business, but knew in December that the sale of its building would not alleviate its problems, and even had to "obtain an emergency adjustment in its lending arrangements so it could survive long enough to complete the sale."  ¶¶ 117, 119.  In November, S&W was told that it was in material breach of a $250-million contract because it had failed to pay subcontractors and suppliers, leading senior executives to embark on a "desperate effort" to stop the project from being terminated.  ¶¶ 108, 110.  In December, in a bid to generate cash, Smith and Langford caused the S&W Employee Retirement Plan Trust to purchase 1 million shares of S&W common stock, raising over $15 million.  ¶ 121.  By the end of the year, "Smith's gasoline credit card was discontinued and newspaper delivery to S&W's building was halted," ¶ 126, while at the Tiverton project site, "trash was building up . . . and spilling out of the dumpsters because S&W had not paid the bills of the trash hauler,"  ¶ 131.

In 2000, the Complaint alleges, the owner of the Tiverton project notified S&W of defaults on its contract because of liens placed on the Tiverton site, and S&W was unable to cure the defaults.  ¶¶ 98, 138.  Cost overruns on the project at that time soared to over $27 million.  ¶ 140.  S&W eventually filed for

bankruptcy in June 2000.  ¶ 155.

In the face of these events, the Complaint alleges, S&W issued false and misleading statements principally in press releases and filings with the SEC, falsely asserting or implying that the Company had sufficient cash, *see, e.g.,* ¶¶ 172, 192, 199, and inadequately disclosing the extent of the Company's financial problems, *see, e.g.,* ¶¶ 283-84, 286-88, 293-94, 298-304, 305-06, 307-10.  For example, in the context of these events, the Company repeatedly announced in its SEC filings that it "believes that the types of businesses in which it is engaged require that it maintain a strong financial condition," and that it "has on hand and has access to sufficient sources of funds to meet its anticipated operating, dividend and capital expenditure needs."  The Company included words to that effect in at least its March 1998 10-Q (filed in May 1998), ¶ 192, September 1998 10-Q (filed in November 1998), ¶ 223, 1998 10-K (filed in March 1999), ¶ 242, March 1999 10-Q (filed in May 1999), ¶ 264, and June 1999 10-Q (filed in August 1999), ¶ 278.  As discussed below, the Company made notable disclosures about its financial difficulties in later filings, most especially in the fall of 1999. Plaintiffs acknowledge these disclosures, but argue that they did not go far enough in revealing the "financial collapse" that was upon S&W.  ¶ 283.

This group of allegations raises four primary questions: (1) Did disclosures made by S&W in the fall of 1999, prior to the first

purchase of S&W stock by the named plaintiffs, adequately apprise investors of the financial problems facing the Company, rendering previous misleading statements immaterial as a matter of law, for purposes of this suit?  (2) If not, do the Complaint's allegations meet the clarity-and-basis requirements of the PSLRA and Rule 9(b)?  (3) Does the Complaint satisfy the PSLRA's required "strong inference" of scienter with respect to Smith and Langford to support claims under Rule 10b-5?  (4) As to some of the allegedly misleading statements made in quarterly and annual filings with the SEC, were they "forward-looking" statements, protected from suit by the PSLRA's safe harbor?

(a) <u>Falsity and materiality.</u>  The district court first ruled, upon the defendants' motion to dismiss, that while some of the Company's statements made prior to the autumn of 1999 might be actionable, none of S&W's statements made after that time were actionable because by then S&W had made full disclosure of its financial woes.  *See In re Stone & Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d at 126.  On that basis, the court granted summary judgment on all outstanding claims.  Although the judgment was not explained, it was apparently based on the following reasoning:  (1) None of the named plaintiffs purchased securities in S&W prior to that time; (2) Any materially false statements made prior to that time had been cured, as a matter of law, by the Company's more revelatory statements made during autumn of 1999; and (3) Because

-42-

the named plaintiffs could not assert claims on their own behalf based on statements made prior to autumn of 1999, they could not do so on behalf of class plaintiffs.[13]

The first question we must consider is whether disclosures made by S&W in the fall of 1999 so completely disclosed the alleged financial problems of the Company that they either corrected, or rendered immaterial as a matter of law, any misleading statements made before that point. We must determine whether S&W sufficiently disclosed the state of affairs at S&W, such that the totality of information offered to investors purchasing after that time could not be considered false or materially misleading.

We find that they did not. Assuming, as we must, the truth of the Complaint's allegations as to the Company's financial condition in the fall of 1999, we find that the Company's statements made at that time, although more revealing than some earlier statements, were not so informative as to correct earlier false statements, or render them immaterial as a matter of law. A jury could reasonably find that the cumulative sum of information provided to investors by that point was still materially misleading.

In their argument that any prior falsity of statements had been cured by the autumn 1999 statements, defendants rely primarily

_____

[13] Plaintiffs do not challenge the district court's assumption that summary judgment would be proper if the autumn 1999 statements adequately apprised investors of the state of S&W's finances. Thus, we do not consider that question.

on a Company press release dated October 27, 1999, and on the quarterly 10-Q filed with the SEC on November 15, 1999.[14] The October 27, 1999, press release announced that the Company intended to sell its corporate headquarters and its cold storage business in order to "enhance liquidity and focus on its core competencies." The document stated that the Company was "not in compliance" with its "principal credit agreement" and stated that it had "requested waivers from its bank group regarding certain covenants" in that agreement. It acknowledged also that S&W could not "continue normal operations" unless it obtained "additional short-term funding." Finally, it stated that "[i]n light of the Company's current liquidity needs," the Board of Directors decided to omit the Company's normal quarterly dividend, and that S&W had retained financial advisors "to assist the Company in arranging and restructuring interim and long-term financing and with asset sales authorized by the board of directors."

In its November 15, 1999, 10-Q filing with the SEC, the Company noted that "losses incurred in the past 24 months have negatively impacted the Company's cash position," and explained:

> As of the end of the third quarter of 1999, the Company had fully drawn the cash available to it under its current credit facility and the amount of the Company's past due trade payables had increased, as reflected in accounts payable on the Consolidated Balance Sheets, with certain of the Company's vendors and subcontractors having delayed work to be performed by them.

---

[14] The Company made prior disclosures, but not to the same extent.

-44-

The falsity of a statement and the materiality of a false statement are questions for the jury. *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *see also In re Cabletron Systems, Inc*, 311 F.3d at 34. *Cf. United States v. Gaudin*, 515 U.S. 506 (1995). A court is thus free to find, as a matter of law, that a statement was not false, or not materially false, only if a jury could not reasonably find falsity or materiality on the evidence presented. *See TSC Industries, Inc.*, 426 U.S. at 450. We cannot agree that *as a matter of law* these disclosures sufficiently apprised investors of all material information regarding the Company's alleged financial condition and corrected or rendered immaterial the falsity of previous statements.

A potential investor after the autumn 1999 statements would likely examine not only the Company's very most recent statements, but also the statements made by the Company in the recent preceding periods. If prior to autumn 1999 the Company had issued false statements, describing its financial condition in misleadingly benign terms, those statements might continue to influence an investor's decision unless they had been retracted, had ceased to be relevant, or their misleading message had been adequately corrected by subsequent revelations or statements. In our view, although the autumn 1999 statements revealed more about the deterioration of the Company's financial conditions than prior statements, we cannot agree that, as a matter of law, a jury could

not reasonably find that after their issuance the totality of the Company's statements continued to be materially misleading as to the Company's financial situation. For one thing, a company which has long maintained a strong financial position but recently fallen into a liquidity crunch may be considered a safer investment than a company with an identical present balance sheet which has been struggling with underfunding for some time. The former may be seen as coping with a sudden temporary reversal, likely to be cured by the good management practices which have long dominated, while in the latter case the current difficulty may appear the inevitable consequence of a continuous history of bad management, which is destined to result in eventual failure. The Company's autumn 1999 statements certainly made significant disclosures, but they did not sufficiently dispel the allegedly misleading picture of a Company which, up to that point, had maintained a strong position.

For example, as we noted above, S&W filings with the SEC made at least through August 1999 contained reassuring assertions informing investors that the Company "has on hand and access to sufficient sources of funds," and even arguably implying that it "maintain[ed] a strong financial condition." *See, e.g.*, ¶ 278. If the Company's financial situation was in fact as dire as alleged by the Complaint, such statements could reasonably be found to be materially misleading. The Complaint portrays S&W as a company in financial distress, spiraling toward bankruptcy — out of cash,

unable to keep up with payments, and with vendors and subcontractors halting work and deliveries and threatening liens.

In our view, the information released by the Company in autumn 1999 did not so clearly correct the alleged falsity of the earlier statements. Rather, a jury could reasonably find that the "'total mix'" of information available to an investor in the fall of 1999 – that is, the totality of new disclosures, read in the context of previous statements by the Company – still was materially misleading, by virtue of both false statements and material omissions. *See TSC Industries, Inc.*, 426 U.S. at 449.

(b) The PSLRA's requirement of clarity and basis. Finding that the dismissal of these claims cannot be supported on the basis of the autumn 1999 disclosures, we must next consider whether the allegations meet the requirements of the PSLRA. We have no doubt that these allegations pass the clarity-and-basis requirements. The Complaint paints a detailed account of the deteriorated financial conditions at S&W, replete with factual support and citations to sources likely to have knowledge of the matter. The Complaint also identifies with specificity the statements alleged to be false and misleading and explains in what respect they were misleading.

(c) Strong inference of required state of mind. In addition to passing the clarity-and-basis test, we find that these allegations also survive the PSLRA's strong-inference requirement.

(i) <u>Claims under 10b-5</u>. Claims under Rule 10b-5 require proof of scienter. The Company statements alleged to be false concealments of its liquidity crunch were made at various times from 1997 to 2000. In order to plead a valid claim against Smith and Langford as to any of these statements, the Complaint must assert facts supporting a strong inference that they acted with scienter at the time the statement was made. We find that the Complaint alleges facts sufficient to support a strong inference of scienter on the parts of both Smith and Langford starting as early as January 1999.

The Complaint alleges that during the summer of 1999 an accounts payable list showing accounts overdue by 600-700 days was being prepared on a regular basis for review by Smith and Langford and that the Company was so strapped for cash that no subcontractor was allowed to be paid without the personal approval of Smith or Langford. ¶ 87. The Complaint further alleges that in the spring of 1999 Smith received calls from vendors and subcontractors demanding payment and threatening to walk off their projects. *Id*. These allegations are clearly sufficient to support a strong inference of scienter for the periods to which they pertain.

The allegations relating to the early part of 1999, which rely more heavily on circumstantial evidence, are nonetheless sufficient in our view, when taken together with the entire mix of alleged facts, to support a strong inference of at least recklessness with

respect to the falsity, if not actual knowledge of the falsity. The financial strength of the Company was undoubtedly a matter of principal concern to its Chief Executive Officer and Chief Financial Officer. The Company's public statements repeatedly stressed the importance of financial strength for a company engaged in S&W's business, before going on to give assurance of S&W's access to ample funds.

The Complaint alleges furthermore that throughout 1998 comprehensive internal financial reports of the Company's current condition were regularly distributed to the Company's top executives. *Id.* Although the contents of the reports are not described, we can fairly infer that they described what they purported to describe – the Company's current financial condition. According to the allegations of the Complaint, the condition that would have been reflected in those internal reports was becoming desperate, so that already the Company had slowed payments to vendors and subcontractors. If by the summer of 1999 such accounts were 600-700 days overdue, it follows that by January 1999, those accounts were 400-500 days overdue, and this was regularly revealed in internal reports distributed to Smith and Langford. An unnamed confidential source, the executive described as the head of S&W's Development Corporation, is quoted in the Complaint as saying that a comparison of the Company's periodic internal reports distributed to the Company's executives with the statements signed by Smith in

the Company's quarterly public reports would lead one to ask "what [Smith] was smoking."  ¶ 72.

Those allegations of particularized facts support a strong inference that by January 1999, both Smith and Langford were either aware of the misleading nature of the Company's reassuring reports, or were at least reckless with respect to their truthfulness on matters of enormous importance.  We therefore vacate the district court's judgment relating to claims under Rule 10b-5 against Smith and Langford for false statements as early as January 1999 and thereafter relating to the Company's liquidity and financial condition.

(ii) <u>Claims under §§ 20(a) and 18.</u>  With respect to claims asserted against Smith and Langford under §§ 20(a) and 18 for statements concealing illiquidity and the deterioration of S&W's financial condition, we vacate the judgment and remand for further proceedings for the same reasons as given above relating to claims under §§ 20(a) and 18.[15]

(d) <u>Safe harbor for forward-looking statements.</u>  As for some of the statements which we ruled could serve as the basis for claims of misleading statements relating to the Company's liquidity and financial condition, the district court ruled in considering the defendant's motion to dismiss that these were within the PSLRA's safe harbor for "forward-looking" statements.  *See In re*

---

[15]  See, though, *supra* note 6.

*Stone & Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d at 125, 130. While the exact wording of these statements varied slightly, they effectively asserted that the Company "has on hand and has access to sufficient sources of funds to meet its anticipated operating, dividend and capital expenditure needs." *See* ¶ 192; *see also* ¶¶ 172, 208, 223, 242. We do not agree with the district court that this statement is necessarily protected by the PSLRA's safe harbor rule.

The statute generally provides, with specified limitations, that issuers and underwriters of securities shall not be liable in any private action based on an untrue or misleading statement of a material fact "with respect to any forward-looking statement" if the forward-looking statement is

> identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, . . . or . . . the plaintiff fails to prove that the forward-looking statement . . . [if made on behalf of a business entity by or with the approval of an executive officer was] made . . . with actual knowledge by that officer that the statement was false or misleading.

*See* 15 U.S.C. § 78u-5(c)(1). The statute thus seems to provide a surprising rule that the maker of knowingly false and wilfully fraudulent forward-looking statements, designed to deceive investors, escapes liability for the fraud if the statement is "identified as a forward-looking statement and [was] accompanied by meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the forward-looking statement." *See id.* § 78u-5(c)(1)(A)(i).

The statute goes on to define "forward-looking" statements as including: "(A) a statement containing a projection of revenues, income . . . earnings (including earnings loss) per share, . . . capital expenditures, dividends, . . . or other financial items; (B) a statement of the plans and objectives of management for future operations . . . ; (C) a statement of future economic performance . . . ; (D) any statement of the assumptions underlying or relating to [any of the above]." *Id.* § 78u-5(i)(1).

The statement in question asserted essentially that the Company "has on hand . . . sufficient sources of funds to meet its anticipated [needs]." Because the statement includes a reference to anticipated future needs for funds, the district court found it to be "forward-looking," apparently concluding that the statement came within the protection granted for "a projection of . . . capital expenditures, dividends, . . . or other financial items." We think that the meaning of this curious statute, which grants (within limits) a license to defraud, must be somewhat more complex and restricted.

By reason of the emphasis on "projection[s]," "plans," and "statement[s] of future economic performance," we understand the statute to intend to protect issuers and underwriters from liability for projections and predictions of future economic

performance, which are later shown to have been inaccurate. *See Webster's Third New International Dictionary* 1814, def. 12b (1976) (defining "projection" as "an estimate of future possibilities based on a current trend"). The legislative history confirms this understanding. The House Conference Report explains that the bill was intended "to enhance market efficiency by encouraging companies to disclose forward looking information" that otherwise might be "muzzled" out of fear that making predictions could later spawn burdensome securities fraud actions. *See* H.R. Conf. Rep. No. 104-369 (1995), 1995 U.S.C.C.A.N. 730, 742.

The problem in applying this statute to the statement in question is that the statement is composed of elements that refer to estimates of future possibilities and elements that refer to present facts. Essentially the statement asserts that the Company has *present* access to funds sufficient to meet anticipated *future* needs. The part of the statement that speaks of the quantity of cash on hand speaks of a present fact. The part that speaks of the amount of "anticipated operating, dividend and capital expenditure needs" speaks of a projection of future economic performance. The claim of fraud, however, does not involve a contention that the defendants were underestimating the amount of their future cash needs. The claim is rather that the defendants were lying about the Company's present access to funds. The Company was, according to the allegations of the Complaint, in an extreme liquidity

crunch.

We believe that in order to determine whether a statement falls within the safe harbor, a court must examine which aspects of the statement are alleged to be false. The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement. The safe harbor, we believe, is intended to apply only to allegations of falsehood as to the forward-looking aspects of the statement. *Cf. Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 (1st Cir. 1996) (examining, in the context of the bespeaks caution doctrine, a statement that "has both a forward-looking aspect and an aspect that encompasses a representation of present fact" and concluding that the doctrine was inapplicable to the extent the statement "encompasses the latter representation of *present fact*"), *superceded by statute on other grounds, as noted in Greebel*, 194 F.3d at 197.

To illustrate the distinction we draw, assume as hypothetical facts that an issuer of securities relating to a business venture carrying an obvious risk of liability (say, the operation of an amusement park) issues a public statement that it has procured liability insurance in amounts sufficient to cover the maximum liability that can be anticipated based on comparable experience. Assume that in the suit, the aspect of the statement alleged to be

fraudulent lies not in the estimate of likely liabilities, but in the fact that the issuer was lying in stating that it had obtained insurance. It in fact had no insurance policy. The accusation of falsity, in other words, lay not in the accuracy of the projection of future financial events, but rather in the representation of a present fact. Notwithstanding that the allegedly false statement "contain[s] a projection of [future] financial items," we do not think Congress intended to grant safe harbor protection for such a statement whose falsity consists of a lie about a present fact.

While our case is not precisely like the hypothetical example, we think the example illustrates that where the falsehood relates to a representation of present fact in the statement, it will not necessarily come within the statute's safe harbor, even though the statement might also contain a projection of future financial experience.

In this case, the alleged falsehood was in the fact that the statement claimed that the Company had access to ample cash at a time when the Company was suffering a dire cash shortage. The claim was not that the Company was understating its future cash needs. In our view, the safe harbor of the PSLRA does not confer a *carte blanche* to lie in such representations of current fact. We reject the district court's conclusion that the statements assuring that the Company had access to sufficient cash to cover anticipated needs were within the safe harbor.

B.    *Claims Against PwC*

Against PwC, the auditor of S&W's accounts, the Complaint asserts claims under Rule 10b-5 and § 18 relating to PwC's unqualified audit opinions on the Company's 1997, 1998, and 1999 financial statements contained in its annual 10-K filings. *See* ¶¶ 343-45.   These opinions are alleged to have been false and misleading in two principal respects:   They stated, first, that S&W's financial statements were prepared in conformity with GAAP, and second, that PWC's audits were performed in accordance with Generally Accepted Auditing Standards ("GAAS").

1.    The PSLRA's Requirement of Clarity and Basis

We first consider whether these claims against PwC meet the PSLRA's requirements for clarity and basis.

The claims that PwC falsely asserted compliance with GAAP focuses on the accounting for the allegedly underbid contracts and for the TPPI project.  We have already considered substantially the same allegations made against Smith and Langford and found that they pass the PSLRA test for clarity and basis.   Because the allegations against PwC are substantially the same for purposes of the clarity-and-basis test, we reach the same conclusion – that the claims against PwC also pass the clarity-and-basis test.

The second set of claims against PwC concerns its statements that its audits were performed in accordance with GAAS.   To the extent that these claims relate to its failure to discover the

-56-

alleged deviations from GAAP in the accounting for the underbid contracts and TPPI, we find that they pass the clarity-and-basis test. The other GAAS claims, however, rest on nothing more than a litany of conclusory allegations of failure to conform to various GAAS standards. The Complaint asserts also that PwC missed various "red flag" warning signs but lacks concreteness as to how the conduct of the audit related to the missed warning signs. *See* ¶¶ 341, 351. With the exception of the GAAS claims relating to the alleged GAAP violations for TPPI and the underbid contracts, we find the GAAS claims insufficient to pass the clarity-and-basis test of PSLRA.

2. <u>Strong Inference of State of Mind</u>

Even while some allegations survive the clarity-and-basis test, they still must meet the strong-inference requirement with respect to any claim demanding proof of scienter.

(a) <u>Claims under Rule 10b-5.</u> As for the claims under Rule 10b-5, which requires proof of scienter, the claims based on both GAAP and GAAS fail completely to allege particularized facts supporting a strong inference of scienter on PwC's part. Plaintiffs point to four types of allegations which they contend are sufficient to pass the test. We disagree.

First, the Complaint makes the conclusory assertion that PwC auditors were "aware of the true facts," which were inaccurately presented in S&W's financials. ¶ 341. As noted above, a plaintiff

does not satisfy the PSLRA's requirement of particularized facts supporting a strong inference of scienter by a conclusory assertion that the defendant knew the true facts, or knew that the challenged statement was false. What is needed is the allegation of particularized facts which give strong support to that conclusion.

Second, the Complaint alleges that PwC missed "red flags." ¶¶ 341, 351. However, the mere fact that an auditor missed what a plaintiff labels warning signs gives little support on its own to the conclusion that an auditor was reckless, much less wilfully blind, with respect to the falsity of information in a financial statement. Here the so-called "red flags" were so described without particularized allegations supporting the recklessness of PwC in missing them when conducting its audits.

Third, plaintiffs point to allegations relating to the improper use of percentage-of-completion accounting on the TPPI project. *See, e.g.*, ¶ 67. But, as noted above, the alleged impropriety under GAAP of using the percentage-of-completion method, with a zero profit assumption, depends on the perception that the project was terminated, as opposed to delayed, and that it would result in a loss. We noted above that these allegations were insufficient to support a strong inference of scienter on the part of Smith and Langford. The case with respect to PwC is *a fortiori*, as PwC had less reason than Smith and Langford to know that TPPI would fail to obtain financing to continue the project.

The final allegations on which plaintiffs rely is PwC's motivation to overlook S&W's concealment of losses in order to protect its own source of lucrative accounting and consulting fees. We do not doubt that such a profit motive could contribute to an auditor's decision to "turn[] a bind eye," *see* ¶ 347, to a corporation's misleading accounting. *See generally* Sarbanes-Oxley Act of 2002, tit. II, Pub. L. No. 107-204, 116 Stat. 745 (codified in various sections of 15 U.S.C.) (addressing concerns raised about auditor independence). Such allegations can thus strengthen an inference of scienter predicated on other facts, possibly adding sufficient strength to satisfy the strong-inference requirement of PSLRA. On the other hand, absent truly extraordinary circumstances, an auditor's motivation to continue a profitable business relationship is not sufficient by itself to support a strong inference of scienter. And here there was virtually nothing else.

We affirm the district court's dismissal of the Rule 10b-5 claims against PwC. The allegations of the Complaint, whether viewed separately or cumulatively, do not rest on particularized facts supporting a strong inference of scienter.

(b) <u>Claims under § 18.</u> Because the PSLRA's strong-inference requirement does not apply to claims under § 18, we vacate the district court's judgment dismissing the claims under § 18 alleging that PwC falsely asserted conformity with GAAP in the accounting

for TPPI and the allegedly underbid projects and with GAAS in PwC's audits relating to that accounting. Once again, we express no view as to whether these claims may be subject to dismissal on other grounds on which the district court did not rule.

C.   *Motion for Leave to Amend*

Plaintiffs also appeal from the district court's denial of their motion for leave to amend the Complaint. Such a ruling is reviewed for abuse of discretion. *See Larocca v. Borden, Inc.*, 276 F.3d 22, 32 (1st Cir. 2002). The district court denied the motion on the basis of undue delay in making the motion. We find no abuse of discretion in that ruling.

However, given that we hereby vacate the judgment terminating the action and remand for further proceedings, plaintiffs may well reassert a motion for leave to amend the Complaint, and the district court may conclude that in the context of a continuing action, the equities affecting such a motion have changed. We express no view on the question of the appropriate disposition of a renewed motion for leave to amend in the continuing action, but leave that to the district court's good judgment.

**Conclusion**

The judgment is affirmed in part and vacated in part. The case is remanded for further proceedings in the district court.[16]

---

[16] We do not purport to have ruled on each of the numerous fraudulent statements alleged in the Complaint. To the extent an allegation of fraud is not discussed in this opinion, the district

Costs are awarded to the appellants.

---

court should rule again on defendants' motion to dismiss, in a manner consistent with the discussions herein. We deny appellees' motion for leave to file a supplemental memorandum. Particularly in light of the Supreme Court's recent decision in *Dura Pharmaceuticals, Inc.*, 125 S. Ct. at 1631-35, we believe appellees' arguments as to loss causation should in the first instance be addressed by the district court. All other pending motions are denied as moot.