**Yaron GISSIN, Individually and on Behalf of All Those Similarly Situated, Plaintiff,**

v.

**Donald L. ENDRES, Danny C. Herron and Bryan D. Meier, Defendants.**

No. 09 Civ. 9338(SAS).

United States District Court, S.D. New York.

Sept. 1, 2010.

Christopher Lometti, Esq., Daniel Brett Rehns, Esq., Cohen Milstein Sellers & Toll P.L.L.C., New York, NY, Evan Jay Kaufman, Esq., David Avi Rosenfeld, Esq., Samuel Howard Rudman, Esq., Robbins Geller Rudman & Dowd LLP(LI), Melville, NY, for Lead Plaintiff Yaron Gissin.

Michael G. Bongiorno, Esq., Ross Eric Firsenbaum, Esq., Wilmer Cutler Pickering Hale & Dorr, L.L.P. (N.Y.), New York, NY, for Defendants.

### OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

Yaron Gissin brings this putative securities fraud class action individually and on behalf of all purchasers of VeraSun Energy Corp. ("VeraSun") common stock between March 12, 2008 and September 16, 2008 (the "Class Period").[1] Gissin asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, for alleged false and misleading statements made by VeraSun regarding its pricing and hedging practices. Plaintiff names as defendants senior executive officers and/or directors of VeraSun, Donald L. Endres, Danny C. Herron, and Bryan D. Meier. VeraSun has filed for bankruptcy and is therefore not named. Defendants now move to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. For the foregoing reasons, defendants' motion is granted in its entirety.

## II. BACKGROUND[2]

### A. Parties

Founded in 2001, VeraSun was a United States corporation whose primary business was producing and marketing ethanol and ethanol-related products.[3] VeraSun "became the first 'pure play' ethanol producer to take its stock public" when it listed on the New York Stock Exchange on June 14, 2006.[4] Because VeraSun filed a Chapter 11 bankruptcy petition in 2008 and is therefore subject to the automatic stay provisions of Section 362(a) of Title 11 of the United States Code, it is not named as a defendant in this action.[5]

All named defendants served as senior executive officers and/or directors of VeraSun during the class period, and are alleged to have signed relevant SEC filings and participated in the issuance of improper statements.[6] Endres served as Chairman of the Board, Director, and Chief Executive Officer.[7] Herron served as Senior Vice President and Chief Financial Officer.[8] Meier served as Vice President,

---

1. *See* Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Complaint" or "Compl.") ¶ 1.

2. The factual background reflects the allegations in the Complaint, which are presumed true for purposes of this motion. In addition, the Court has taken judicial notice of documents incorporated into the Complaint by reference and public disclosures on file with the Securities and Exchange Commission ("SEC").

3. *See* Compl. ¶ 2.

4. *Id.* ¶ 33.

5. *See id.* ¶ 19.

6. *See id.* ¶¶ 20–22. The Complaint does not identify the precise dates of defendants' service in their respective positions.

7. *See id.* ¶¶ 20, 75.

8. *See id.* ¶ 21.

Finance and Chief Accounting Officer.[9]

## B. VeraSun's Ethanol Operations

Ethanol is made primarily from corn, and is blended into gasoline for use in automobiles.[10] VeraSun's profit or loss depended on the difference between the price it paid for corn, and the price it received for ethanol (the "Crush Spread").[11] Ethanol prices are largely determined by the gasoline market, while corn prices are largely determined by crop conditions.[12] Because the prices of input and output are not necessarily correlated, VeraSun was vulnerable to low or negative margins and used hedging arrangements, like futures contracts, to "offset the effects of volatility of ethanol prices and corn and natural gas costs."[13] These risk management tactics could, however, "themselves result in losses when a position is purchased in a declining market or a position is sold in a rising market."[14]

VeraSun rapidly expanded its refining capacity through acquisitions of ASA OpCo Holdings, LLC ("ASA") in 2007 and U.S. BioEnergy ("BioEnergy") in 2008.[15] These acquisitions added eleven produc-

tion facilities—three of which were under construction—to VeraSun's existing operations and ongoing efforts to construct three new plants of its own.[16] The company indicated that it "was poised to grow 613% in production capacity from 14 new operating facilities in two years."[17]

In May 2008, VeraSun secured a 125 million dollar credit facility from UBS Investment Bank ("UBS") with the publicized aim of "provid[ing] additional liquidity sources to support [VeraSun's] accelerated growth."[18] The new credit facility replaced an existing thirty million dollar secured revolving credit facility.[19] In an Earnings Call with industry analysts on May 13, 2008, Endres explained that the company considered its credit facility to be "a liquidity insurance policy" for working and capital needs, and anticipated that "there will be times that [VeraSun] will draw on it" to address "imbalance[s] of inventories and receivables" resulting from the large increases in the gallons of ethanol the company would be shipping in each subsequent quarter of the year.[20]

9. *See id.* ¶ 22.

10. *See id.* ¶ 32.

11. *See id.* ¶ 58.

12. *See id.*

13. VeraSun SEC Form 10–K for Fiscal Year 2007 filed on March 12, 2008 (the "2007 10–K"), Ex. 3 to the Declaration of Michael G. Bongiorno, counsel for Defendants, in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Bongiorno Decl.") at 13.

14. *Id.*

15. *See* Compl. ¶ 61.

16. *See id.* ¶¶ 3, 39.

17. *Id.* ¶ 38.

18. June 2, 2008 press release quoting Herron, Ex. 1 to the Declaration of Ross E. Firsenbaum, counsel for Defendants, in Support of Defendants' Motion to Dismiss the Complaint ("Firsenbaum Decl.").

19. *See id.*

20. VeraSun Energy Corporation Q1 2008 Earnings Call on March 13, 2008 ("Q1 Call"), attached in part as Ex. 9 to Bongiorno Decl., available in full at http://static2.seekingalpha.com/article/77113–verasun–energy–corporation–q1–2008–earnings–call–transcript?fmd=year ("Quite honestly, we're going from shipping 195 million gallons in the first quarter to shipping 300 million to 325 million in the second. And the third quarter will probably be approaching 400

## C. VeraSun's Economic Collapse

VeraSun's capital-intensive development efforts occurred against a backdrop of challenging market conditions for ethanol producers. In early June 2008, severe flooding in the midwest caused the price of corn to skyrocket to almost eight dollars a bushel.[21] In turn, the Crush Spread narrowed considerably from a high of over $2.50 in early 2006 to less than fifty cents in 2008.[22] Shortly thereafter, on June 25, 2008, the company announced that, "[i]n light of current market conditions," it had halted construction of three refineries and delayed the start up of three recently completed refineries.[23]

In July 2008, VeraSun aborted its short positions in corn in favor of accumulator contracts, "which required little or no cash up front" but posed a greater risk.[24] The accumulator contracts committed VeraSun to purchase corn at regular intervals at the average discounted price of $6.50–$7.00 a bushel for the next year.[25] In the event that market prices declined, VeraSun was obliged to "purchase twice as much corn as originally committed to" under the contracts' standard "step-up" feature.[26] When the market price of corn "sharp[ly] declined from almost $8.00 per bushel to nearly $5.00 per bushel" in July and August 2008, VeraSun incurred millions of dollars in losses: "[w]ith VeraSun produc-

ing 1.4 billion gallons of ethanol a year, the additional expense resulting from the accumulator contracts quickly overwhelmed any cash flow from the sale of ethanol."[27]

On August 14, 2008, VeraSun commenced a secondary public offering for $750 million dollars.[28] In its S–3, a required securities registration form filed with the SEC, the company explained its intent "to use the net proceeds of any offering of our securities for working capital and other general corporate purposes, which may include the repayment or refinancing of outstanding indebtedness," but reserved "significant discretion in the use of any net proceeds."[29]

On September 16, 2008, VeraSun filed a Form 8–K with the SEC, which "is the 'current report' companies must file with the SEC to announce major events that shareholders should know about."[30] The report alerted investors of the accumulator contracts the company had secured in July, and of the termination of its short financial positions to hedge its procurement of corn.[31] The report disclosed that the subsequent sharp decline in corn prices led VeraSun to expect "to incur a net loss for the third quarter of 2008 in the range of $63 million ($0.40 per share) and $103 million ($0.65 per share)."[32] The next day, the company's stock price

---

million gallons. So there's a large increase in working capital requirements.").

21. *See* Compl. ¶ 6.

22. *See id.* ¶ 59.

23. *Id.* ¶ 53.

24. *Id.* ¶ 6.

25. *See id.* ¶¶ 7–8; VeraSun SEC Form 8–K filed on September 16, 2008 (the "September 2008 8–K"), Ex. 8 to Bongiorno Decl.

26. Compl. ¶ 66.

27. *Id.* ¶ 8.

28. *See id.* ¶ 73.

29. VeraSun Form S–3 filed on August 14, 2008 (the "Form S–3"), Ex. 11 to Bongiorno Decl.

30. SEC Form 8–K, http://www.sec.gov/answers/form8k.htm.

31. *See* September 2008 8–K, Ex. 8 to Bongiorno Decl.

32. *Id.*

plunged seventy percent.[33] Six weeks later, on October 31, 2008, VeraSun filed for Chapter 11 bankruptcy protection.[34]

### D. Allegedly False and Misleading Statements and Material Omissions

Plaintiffs allege that throughout the Class Period, "Defendants kept investors in the dark about critical information regarding the Company's massive liquidity problems and falsely represented that [VeraSun] had sufficient cash to meet its needs."[35] Specifically, plaintiffs contend that VeraSun's rapid expansion created an ongoing and "crippling" liquidity problem, of which defendants were aware by March 12, 2008, even as they "publicly stated that VeraSun had sufficient cash to meet its financial obligations" through press releases, SEC filings, and earnings conference calls with analysts.[36] Plaintiffs also posit that defendants intentionally obscured VeraSun's growing "liquidity crisis" from investors by "changing internal accounting processes so cash would be available at the corporate level, rather than at the level of individual production,"[37] as well as by misstating "the real reason ... [of] cash flow issues" underlying its decisions to secure the 125 million dollar credit facility; halt construction and delay production at several refineries; and commence a second public offering.[38] Plaintiffs allege that "the Company finally admitted it was suffering a cash shortage" only when the massive losses generated by the accumulator contracts made it impossible to "maintain the illusion of strong liquidity" in September 2008.[39]

## III. LEGAL STANDARD

### A. Motion to Dismiss

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[40] and "draw all reasonable inferences in the plaintiff's favor."[41] However, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness."[42]

In deciding a motion to dismiss, the court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[43]

---

**33.** *See Compl.* ¶ 11.

**34.** *See id.*

**35.** Lead Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Pl. Opp.") at 1. To support their assertions of an ongoing liquidity crisis at the company, plaintiffs offer the testimony of several confidential witnesses who were employed by the company at various points throughout the class period. *See Compl.* ¶¶ 42–57.

**36.** Compl. ¶¶ 89, 42.

**37.** *Id.* ¶ 56.

**38.** *Id.* ¶¶ 47, 54; *see id.* ¶¶ 49, 53, 73.

**39.** *Id.* ¶ 56.

**40.** *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir.2009).

**41.** *Ofori–Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir.2006).

**42.** *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir.2007) (quotation marks omitted).

**43.** *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007).

### 1. Pleading Requirements

■ "Federal Rule of Civil Procedure 8(a)(2) requires ... 'a short and plain statement of the claim showing that the pleader is entitled to relief.' "[44] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[45] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[46] Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[47] Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[48]

### 2. Securities Fraud

■ "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."[49] These heightened pleading requirements are imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").[50]

### a. Rule 9(b)

■ A complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud ... be stated with particularity."[51] "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[52] To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[53] "Allegations that are conclusory or unsupported by factual assertions are insufficient."[54]

### b. The PSLRA

■ The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud."[55] The PSLRA specifies that the plaintiffs must "state with particularity

**44.** *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting Fed.R.Civ.P. 8(a)(2)).

**45.** *See Twombly*, 550 U.S. at 564, 127 S.Ct. 1955. *Accord Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (noting that *Twombly* 's standard of plausibility is not limited to antitrust cases).

**46.** *Iqbal*, 129 S.Ct. at 1949 (quotation marks omitted).

**47.** *Id.* (quotation marks omitted).

**48.** *Id.* (quotation marks omitted).

**49.** *ATSI*, 493 F.3d at 99.

**50.** *See* 15 U.S.C. § 78u–4(b).

**51.** Fed.R.Civ.P. 9(b). *Accord ATSI*, 493 F.3d at 99.

**52.** *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.2004)).

**53.** *Rombach*, 355 F.3d at 170 (quotation marks omitted). *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000)).

**54.** *ATSI*, 493 F.3d at 99.

**55.** *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quotation marks omitted) (citing 15 U.S.C. § 78u–4(b)(1), (2)). *Accord ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir.2009).

facts giving rise to a strong inference that the defendant acted with the required state of mind." [56] When evaluating allegations of scienter, the court must look at the complaint as a whole and "take into account plausible opposing inferences." [57]

■■■ "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." [58] In other words, a plaintiff must present a "strong inference" of scienter.[59] The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." [60] The inquiry on a motion to dismiss is as follows: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" [61] "If the plaintiff alleges a false statement or omission, the PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " [62]

## B. Section 10(b) and Rule 10b–5

■■■ To state a claim under Rule 10b–5 for misrepresentations, a "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." [63]

### 1. Misstatements or Omissions of Material Fact

■■■ In order to satisfactorily allege misstatements or omissions of material fact, a complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made." [64] In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." [65] Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of

**56.** *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499 (quoting 15 U.S.C. § 78u–4(b)(2)).

**57.** *Id.* at 323, 127 S.Ct. 2499. These plausible opposing inferences may be based only on the complaint and other public documents on which courts ordinarily rely in deciding a motion to dismiss, "while constantly assuming the plaintiff's allegations to be true." *Id.* at 322, 326–27, 127 S.Ct. 2499.

**58.** *Id.* at 314, 127 S.Ct. 2499.

**59.** *ECA,* 553 F.3d at 196.

**60.** *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499 (citation omitted).

**61.** *Id.* at 326, 127 S.Ct. 2499. Accord *id.* at 324, 127 S.Ct. 2499 ("A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

**62.** *ATSI,* 493 F.3d at 99 (quoting 15 U.S.C. § 78u–4(b)(1)).

**63.** *Id.* at 105 (affirming the dismissal of plaintiffs' misrepresentations claims) (citing *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.2005)).

**64.** *Rombach,* 355 F.3d at 172 (quotation marks omitted).

**65.** *Novak,* 216 F.3d at 309 (citation omitted).

securities fraud." [66]

■ Certain statements are protected by the PSLRA's safe harbor provision and the bespeaks caution doctrine. Under the safe harbor provision, a forward-looking statement is non-actionable when it is "accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." [67] "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information" [68] identifying "important factors that could cause actual results to differ materially from those in the forward-looking statements." [69] Moreover, statements are not protected where defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality." [70] The applicability of the immateriality prong of the safe harbor "necessarily depends on all relevant circumstances." [71] Under the judicially created bespeaks caution doctrine, "alleged misrepresentations . . . are deemed immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language. . . ." [72] Under the "truth-on-the-market" doctrine, information already known on the market is also immaterial.[73] Statements may also be deemed immaterial as merely vague expressions of optimism or puffery.[74] Liability under the actual knowledge prong of the safe harbor "attaches only upon proof of knowing falsity"—a showing of recklessness is insufficient.[75] Lastly, pleadings based on fraud by hindsight are not actionable as a matter of law.[76]

---

**66.** *Id.* (citation omitted). *Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000) ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness: People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.") (quotation marks omitted).

**67.** *Slayton v. American Express Co. ("Slayton II")*, 604 F.3d 758, 766 (2d Cir.2010).

**68.** *Id.* at 772.

**69.** 15 U.S.C. § 78u–5(c)(1)(A).

**70.** *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 629 (S.D.N.Y.2003). *Accord Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F.Supp.2d 407, 419 (S.D.N.Y.2000) (observing that the bespeaks caution doctrine "does not apply where a defendant knew that its statement was false when made"). The Second Circuit has not decided "the thorny issue" of whether an issuer may be "protected by the meaningful cautionary language prong of the safe harbor even where his cautionary statement omitted a major risk that he knew about at the time he made the statement." *Slayton II*, 604 F.3d at 772.

**71.** *ECA*, 553 F.3d at 197.

**72.** *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002).

**73.** *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 159 (2d Cir.2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp.2d 221, 238 (S.D.N.Y.2006).

**74.** *See ECA*, 553 F.3d at 206; *In re Gildan Activewear, Inc.*, 636 F.Supp.2d 261, 274 (S.D.N.Y.2009); *In re NTL, Inc. Sec. Litig.*, 347 F.Supp.2d 15, 34 (S.D.N.Y.2004).

**75.** *See Slayton II*, 604 F.3d at 773.

**76.** *See Caiafa v. Sea Containers, Ltd.*, 525 F.Supp.2d 398, 410–11 (S.D.N.Y.2007).

## 2. Scienter

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[77] "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[78] "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[79]

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[80] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[81] "To state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information they had a duty to monitor."[82]

## 3. Loss Causation

To satisfy the fifth prong of a Rule 10b–5 claim, a plaintiff must plead loss causation.[83] Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[84] "A misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations....'"[85] "To plead loss causation," therefore, "the complaint[ ] must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear

**77.** *ATSI*, 493 F.3d at 99 (citing *Ganino*, 228 F.3d at 168–69). *Accord In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 398 (S.D.N.Y.2007) (holding that plaintiffs adequately pleaded scienter because the allegations supported the inference that the company and the officers were at least reckless in not knowing that the financial statements were false and in failing to disclose internal control weaknesses); *In re eSpeed, Inc. Sec. Litig.*, 457 F.Supp.2d 266, 292 (S.D.N.Y.2006) (holding that plaintiffs must "specifically allege defendants' knowledge of facts or access to information contradicting their public statements").

**78.** *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001) (quotation marks omitted).

**79.** *Id. Accord ECA*, 553 F.3d at 198.

**80.** *Kalnit*, 264 F.3d at 142. *Accord South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir.2009); *In re Novagold*

*Res. Inc. Sec. Litig.*, 629 F.Supp.2d 272, 297 (S.D.N.Y.2009) (quoting *ECA*, 553 F.3d at 198–99).

**81.** *South Cherry St.*, 573 F.3d at 109. (quotation marks and emphasis omitted). *Accord ECA*, 553 F.3d at 203.

**82.** *Gildan Activewear*, 636 F.Supp.2d at 272 (quotation marks and citation omitted).

**83.** *See ATSI*, 493 F.3d at 106.

**84.** *Id.* at 106–07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Lentell*, 396 F.3d at 172). *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir.2003).

**85.** *In re Omnicom Group, Inc. Secs. Litig.*, 597 F.3d 501, 513 (2d Cir.2010) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

**504**

upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." [86]

### C. Section 20(a)

■ "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." [87] "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." [88] Thus, " '[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.' " [89]

### D. Amendments to Pleadings

■ "Rule 15(a) provides that, other than amendments as a matter of course, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." [90] "[W]hether to permit a plaintiff to amend its pleadings is a matter committed to the Court's sound discretion." [91] However, the Supreme Court has explained that

> [i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." [92]

Accordingly, " '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.' "

## IV. DISCUSSION

### A. Section 10(b) and Rule 10b–5

For the reasons discussed herein, I conclude that the facts asserted in the Complaint, when stripped of their conclusory allegations, neither plausibly establish material misrepresentations by the defendants nor support a strong inference of scienter. Plaintiffs thus fail to state a section 10(b) claim upon which relief may be granted.

#### 1. Material Misrepresentations or Omissions

#### A. Forward–Looking Statements

Defendants assert that any alleged misstatements are immunized from liability

---

86. *Lentell*, 396 F.3d at 175.

87. *ATSI*, 493 F.3d at 108 (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)).

88. *In re Parmalat Sec. Litig.*, 414 F.Supp.2d 428, 440 (S.D.N.Y.2006).

89. *In re Scottish Re*, 524 F.Supp.2d at 385. Accord *In re Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006) (quoting *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 415–16 (S.D.N.Y.2003)).

90. *Slayton v. American Express Co. ("Slayton I")*, 460 F.3d 215, 226 n. 10 (2d Cir.2006) (quotation marks omitted).

91. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.2007) (quotation marks omitted).

92. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Accord *Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir.2002).

under the safe harbor provision of the PSLRA. As a threshold matter, plaintiffs counter that the safe harbor is inapplicable because the statements at issue "primarily concern the Company's *current* access to funds to meet its operating and capital expenditure needs" and are thus not forward-looking.[93] Alternately, plaintiffs argue that "[e]ven if the statements are deemed forward-looking ... Defendants' failure to provide meaningful cautionary language disclosing known risks about VeraSun's existing liquidity predicament prevents Defendants' reliance on this doctrine."[94]

■ An examination of the Complaint and incorporated documents corroborates defendants' assertion that the statements at issue were indeed forward-looking.[95] The PLSRA defines forward-looking statements as those which speak predictively about the future, such as "a projection of revenues ... or other financial items;" "a statement of the plans and objectives of management for future operations," or "a statement of future economic performance."[96] Where a statement contains references to both future and past or present conditions, safe harbor protection may only extend to the prognostic portion.[97] Thus, "in order to determine whether a statement falls within safe harbor, a court must examine which aspects of the statement are alleged to be false."[98]

Plaintiffs allege that defendants falsely assured investors of the "future outlook for VeraSun's liquidity" on the basis of VeraSun's "prior and present" cash status, thereby grounding their statements in the present and precluding safe harbor protection.[99] Yet plaintiffs do not actually contest the veracity of any present tense portion of defendants' statements—to the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, "when read in context, cannot meaningfully be distinguished from the future projection of which they are a part."[100]

■ For example, to demonstrate that VeraSun's disclosures were oriented in the present, plaintiffs offer as evidence the following statement: "[B]ased on our *current* expectation of cash flows from operations and the cash and cash equivalent short-term investments, and also our revolving credit facility, we feel we will be in a position to fund those capital investments for the year."[101] Plaintiffs allege—

93. Pl. Opp. at 10.

94. *Id.*

95. Even absent safe harbor protection however, plaintiffs have neither adequately pled the falsity of the statements, nor defendants' scienter. *See infra* Parts I.B and II.A–B.

96. Pl. Opp. at 10.

97. Plaintiffs claim that defendants' statements are not forward-looking because "mixed statements of present, past and future condition are not entitled to the protections of the safe harbor provision," but they misstate the case law upon which they rely. *See* Pl. Opp. at 10; *Stone & Webster, Inc. Sec. Litig.,* 414 F.3d 187, 213 (1st Cir.2005) ("The safe-harbor ... appl[ies] ... to allegations of falsehood as to the forward-looking aspects of the statement."). *Accord Institutional Investors Group v. Avaya, Inc.,* 564 F.3d 242, 255 (3d Cir.2009); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 705 (7th Cir.2008) ("*Tellabs II*") ("[A] mixed present/future statement is not entitled to the safe harbor with respect to *the part of the statement* that refers to the present.") (emphasis added).

98. *Stone & Webster,* 414 F.3d at 213.

99. Pl. Opp. at 9.

100. *Avaya,* 564 F.3d at 255.

101. Pl. Opp. at 9. *Accord* Compl. ¶ 83.

somewhat deceptively—that the statement constituted a false assurance "that the Company's **liquidity was strong**." [102] Yet the actual statement "do[es] not justify the financial projections in terms of any particular aspect of the company's current situation" but "say[s] only that, whatever that situation is, it makes the future projection attainable." [103] As such, it merely presents "an assertion [that] is necessarily implicit in every future projection." [104]

In other words, context is everything. Defendants' statement was made during an earnings conference call discussing the financial results for the preceding quarter, and the SEC filings for the period were the foundation of the discussion. [105] Defendants were not making guarantees about the present; they were stating their educated guess about what the preceding quarter's financial data would mean for the Company's future.

Plaintiffs are contesting the accuracy of the future prediction. They do not refute that the SEC filings, which defendants were referencing in their responses throughout the call, were in any way incorrect or that they did not show a successful quarter. Despite plaintiffs' best efforts at language construction, defendants' statement is forward-looking. As defendants rightfully point out, "Plaintiffs highlight [the word] 'current' but ignore that it plainly modifies 'expectation' and also ignore the forward-looking 'we feel we will be' conclusion." [106] Moreover, the SEC

---

**102.** Compl. ¶ 83. Defendants rightfully note that while plaintiffs "repeat the mantra that the Defendants falsely claimed that the Company had 'strong' liquidity" throughout the Complaint, they "cite no actual statements" in support of this allegation—instead, plaintiffs independently characterize defendants' statements as conclusive assurances of strong liquidity. Defendants' Reply Memorandum in Support of Their Motion to Dismiss the Complaint ("Def. Rep.") at 1. For example, plaintiffs allege that VeraSun fraudulently "described [its] liquidity position as being strong" in a financial filing where the term "strong" did not once appear, and cite as an example the Company's tepid forecast that "based on current market conditions . . . we believe that our existing sources of capital will be sufficient to fund anticipated working capital requirements . . . for at least the next twelve months." Compl. ¶ 92; see Second Quarter 2008 10-Q filed on Aug. 11, 2008 ("2Q 10-Q 2008"), Ex. 5 to Bongiorno Decl.

Plaintiffs similarly misconstrue the singular instance where defendants actually used the term "strong" in the relevant record. In an earnings conference call, Herron retroactively described a concluded financial quarter as "strong" before providing uncontested examples—including "record sales"—of its accomplishments. VeraSun 2008 Second Quarter Earning Conference Call on August 12, 2008 ("Q2 Call"). Yet despite Herron's limited, backwards looking and substantiated use of

the term, plaintiffs denote his remarks as a false assurance that VeraSun's "liquidity was 'strong'" at the time they were made. Compl. ¶ 103. In fact, in response to a direct question about whether VeraSun "ha[d] enough liquidity to continue to open the plants and finance existing operations," Herron specifically disclaimed any concrete assurances about the sufficiency of its cash reserves. Q2 Call. Instead, he offered only a tentative yes based "on our current view given market conditions" in "an extremely volatile market" that is "all over the board," and provided examples of the market's extreme fluctuations over the last two months. *Id.* Plaintiffs' conclusory allegations cannot serve as a substitute for the facts, particularly when they are plainly contradicted by the record referentially incorporated in the Complaint. *See In Re Centerline*, 678 F.Supp.2d 150, 155–156 (S.D.N.Y.2009) (noting that conclusory allegations are insufficient to defeat a motion to dismiss when they lack a substantive factual basis).

**103.** *Avaya*, 564 F.3d at 255.

**104.** *Id.*

**105.** *See* Compl. ¶ 83.

**106.** Def. Rep. at 2. In doing so, plaintiffs continue their practice of selective and misleading language in pleading fraud. But

has opined, and the Second Circuit has concurred, that "[t]he use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward looking" satisfies safe harbor.[107] Because all of defendants' alleged misstatements are similarly cast in predictive terms, they are by definition forward-looking.[108]

plaintiffs' textual distortions—while perhaps charitably viewed as an exercise in zealous lawyering—cannot support the expulsion of a forward-looking statement from safe harbor protection. For example, plaintiffs allege that Endres "assured analysts that the Company *had* sufficient working capital," on the basis of the predictive statement, "[w]e think working capital *will* stay about where it is for the *balance* of the year." Compl. ¶ 84 (emphasis added). Similarly, plaintiffs claim that "Defendant Herron assured investors that the Company *had* 'liquidity flexibility to continue to run our business,'" when he was in fact responding to a question about the "expect[ed]" use of a credit line the company was shortly due to acquire. Compl. ¶ 88 ("We think our construction capital's probably provided. Of course, that always depends on your margin assumptions . . . and where the market ends up going . . . [The credit line] provides us with some liquidity flexibility to continue to run our business and grow our business."); *see id.* ¶ 47. Forecasts of future events are necessarily contingent on present circumstances, but it is a game of semantics to label them as grounded in the present.

**107.** *Slayton II*, 604 F.3d at 769 (noting "the common-sense proposition that words such as 'expect' identify forward-looking statements").

**108.** In support of their claim that defendants' statements are not forward-looking, plaintiffs cite to *Stone & Webster*, a case they deem "strikingly similar" to this case. Pl. Opp. at 10. In *Stone & Webster*, the First Circuit found safe harbor inapplicable where "the alleged falsehood was in the fact that the statement claimed that the Company had access to ample cash at a time when the company was suffering a dire cash shortage." 414 F.3d at 213. "Insofar as that present situation was related to future projections, the *Stone & Webster* language bears a superficial resemblance to the language here." *Avaya*, 564 F.3d at 256. The crux of the claim in *Stone & Webster*, however, "was not merely that the company would hit a certain target in the future, but rather that the company had, at the present moment, enough funding to meet future liabilities." *Id.* at 256–57. In contrast, defendants' statements in the instant case refer to present circumstances only as a basis for forecasting future performance, not as a guarantee of the status quo. *See, e.g.*, Compl. ¶ 83 (". . . Based on our current expectation of cash flows from operations and . . . investments, and also our revolving credit facility, we feel we will be in a position to fund those capital investments for the year . . ."); *id.* ¶ 84 (". . . [Covenants on project-debt] are self-funding and they are all profitable at this point; I don't anticipate any issues there . . ."); *id.* ¶ 95 (". . . based on our current view and what we know, yes, we think we'll be just fine . . ."). As such, they are more closely aligned with the circumstances of *Avaya*, in which the Third Circuit determined that defendants' assertions that their Company was "on track" and "position[ed]" to meet its goals were not actionable, notwithstanding contentions that the Company failed to disclose internal problems which made its projections highly improbable. *See Avaya*, 564 F.3d at 256. The court reasoned that the statements at issue were forward-looking because defendants did not "advert to a particular current fact such as cash on hand, but expressed only defendants' continuing comfort" that they would be able to meet their financial projections and satisfy their financial requirements in the future. *Id.*

Indeed, plaintiffs' Complaint does not dispute the accuracy of any financial data presented in VeraSun's SEC filings or public disclosures. Plaintiffs speculate by hindsight that VeraSun's September 2008 disclosure of its "massive losses from bad bets on corn . . . only **one month** after Defendants announced positive earnings" must imply an ongoing liquidity crunch that predated the announcement. Compl. ¶ 103. But because plaintiffs do not challenge the second quarter "positive earnings" reported in August 2008, plaintiffs effectively argue only that the defendants' prediction of the Company's future welfare turned out to be wrong—and, as noted in *Avaya*, such predictions fall squarely within

The ensuing question is whether safe harbor in fact immunizes the forward-looking statements at issue, either because they are sufficiently identified and accompanied by meaningful language or because plaintiffs failed to allege that they were made with actual knowledge of falsity.[109] Plaintiffs do not dispute—in either their Complaint or opposition papers—that the statements at issue were identified as forward-looking,[110] but they assert that defendants "failed to provide meaningful cautionary language disclosing known risks about VeraSun's existing liquidity predicament."[111] Plaintiffs identify these risks as the immense capital required by VeraSun's expansion efforts[112] and the "tremendous financial exposure" resulting from the accumulator contracts.[113]

■ Contrary to plaintiffs' assertion that any " 'risk factors' cited by defendants are unspecific and uninformative," even a cursory look at the record reveals that defendants directly acknowledged the very risks plaintiffs fault for their losses.[114] *First*, in regards to the inherent dangers

of VeraSun's rapid expansion, defendants explicitly proffered warnings about the Company's "high level of debt"—including specific amounts outstanding and expected increases owing to VeraSun's mergers and expansion efforts.[115] They elaborated on the "significant consequences" that the debt could pose for shareholders, such as: "reducing the availability of cash flow for working capital, capital expenditures and other general business activities; ... limiting the flexibility in planning for, or reacting to, changes in the business and industry in which we operate; ... [and] increasing our vulnerability to both general and industry-specific adverse economic conditions."[116] Defendants provided detailed figures concerning all of the Company's capital resources and obligations, none of which are disputed by plaintiffs. They underscored the fact that while current market conditions supported their belief that existing sources of capital were sufficient to fund operations for the next year, "cash flows from future operations and the amount and timing of our future financing

safe harbor. *See also One Communications Corp. v. J.P. Morgan SBIC LLC*, 381 Fed.Appx. 75, 79, 2010 WL 2512306, at *3 (2d Cir.2010) (finding complaint insufficient, without more, to establish fraud under section 10(b) where plaintiffs simply alleged the falsity of defendants' financial representations, warranties and covenants in Merger Agreement but did not challenge the underlying accounting).

109. *Slayton II*, 604 F.3d at 766.

110. In any event, all of the statements pertaining to VeraSun's SEC filings or earnings conference calls were explicitly identified as forward-looking. To the extent that plaintiffs contest any other statements, the Second Circuit has made clear that a forward-looking statement need not be specifically labeled, so long as the "facts and circumstances of the language used" indicate that it "projects results in the future." *Slayton II*, 604 F.3d at 769. Because plaintiffs contest the accuracy of defendants' economic forecasts, and not, as elaborated previously, defendants' reporting

of present facts, all of the statements at issue are sufficiently identified as forward-looking.

111. Pl. Opp. at 11.

112. *See* Compl. ¶¶ 3–4 ("The demise of VeraSun began as a result of VeraSun's attempts to expand simultaneously through the opening of ethanol refineries and the acquisition of U.S. BioEnergy [because the] tremendous amounts of cash needed to build these new facilities quickly placed Company in a precarious financial position.").

113. *Id.* ¶ 6.

114. Pl. Opp. at 12.

115. 2007 10–K, Ex. 3 to Bongiorno Decl. at 23; *see also id.* at 14, 25–28, 45–47; First Quarter 2008 10–Q filed on May 12, 2008 ("1Q 2008 10Q"), Ex. 4 to Bongiorno Decl. at 32; 2Q 2008 10–Q at 9–10, 32, 44, 47.

116. 2007 10–K at 23.

needs are inherently uncertain."[117] Defendants also starkly stated "[o]ur common stock price has been volatile and you may lose all or part of your investment."[118]

*Second,* defendants made clear that the Company's financial position "could fluctuate substantially" because it is "highly dependant on commodity prices, which are subject to significant volatility and uncertainty" and consistently gave examples of specific market fluctuations affecting the Company at any given time.[119] Defendants explained that they are "unable to pass along increased corn costs to our customers."[120] They noted that they "use hedging positions," including "fixed-price forward contracts" up to a year in advance, to "attempt to offset a portion of the effects of fluctuations in prices," and that "these activities also involve substantial risks."[121] Defendants elaborated that these risks included:

> "the prices involved and our ability to sell sufficient products to use all of the corn and natural gas for which we have futures contracts; ... [the possibility that] "the other party to the hedging contract defaults; ... change[s] in the expected differential between the price of the commodity underlying the hedging agreement and the actual prices paid or received by us [in exchange-traded contracts]; ... [and the danger that the] hedging activities can themselves result in losses when a position is purchased in a declining market or a position is sold in a rising market."[122]

■ Defendants clearly did more than "refer to the most general of economic risks."[123] Their warnings were not generic or boilerplate, but contained comprehensive financial and analytical data about the Company's liabilities in reference to existing market conditions. To the extent that defendants remarked on the Company's anticipated future performance, they properly "point[ed] to the principal contingencies that could cause actual results to depart from the projection."[124] Defendants' statements expressly cautioned investors about all of the factors plaintiffs blame for VeraSun's eventual demise—the extreme fluctuations in the price of corn and the corresponding narrowing of the Crush Spread, VeraSun's ambitious expansion efforts in a tight market, and the Company's entry into high risk accumulator contracts.[125] It was common knowledge that VeraSun carried more debt than comparable companies, and the exact amount of its outstanding obligations was fully disclosed in its SEC filings and discussed with analysts in earnings calls.[126] Indeed, plaintiffs concede that they were aware of all these

**117.** 1Q 2008 10–Q at 42–43; *see also* 2Q 2008 10–Q at 43.

**118.** 2007 10–K at 29.

**119.** *Id.* at 6–7, 11–13; *see also* 1Q 2008 10–Q at 42–43; 2Q 2008 10–Q at 45–46.

**120.** 2007 10–K at 11–12.

**121.** *Id.*

**122.** *Id.*

**123.** *Schottenfeld Qualified Assoc. v. Workstream, Inc.,* No. 05 Civ. 7092, 2006 WL 4472318, at *3 (S.D.N.Y. May 4, 2006).

**124.** *In re IAC/InterActiveCorp Sec. Litig.,* 478 F.Supp.2d 574, 586 (S.D.N.Y.2007) (citation omitted).

**125.** *See* Compl. ¶¶ 3–4, 6 (identifying these factors as the reasons for VeraSun's alleged liquidity crisis).

**126.** *See, e.g.,* VeraSun Q4 2007 Earnings Call, March 31, 2008 (noting analyst's comment that "when I look at your balance sheet as compared to some of the other manufacturers, you obviously are carrying more debt").

conditions.[127] Fraud cannot be established by "[t]he naked assertion of concealment of material facts," when these facts were actually disclosed in "published documents" or otherwise relayed to investors.[128]

■ The cautionary language proffered by defendants "relate[d] directly to that by which the plaintiffs claim to have been misled,"[129]—namely, "VeraSun's cash position and liquidity."[130] Despite plaintiffs' conclusory allegations to the contrary, the record indicates that defendants never asserted that VeraSun's liquidity was "strong" and hence assured, but in fact specifically alerted investors that its cash flows and cash needs are "inherently uncertain" because they are based on various enumerated factors "beyond our control."[131] When the statements at issue are read together with the cautionary language, there is no plausible indication that "a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist."[132] Moreover, it is common sense that VeraSun's financial stability was not secure in light of volatile market conditions, the "oppressive" terms of the accumulator contracts, and its outstanding debt.[133] "The securities laws do not require that investors be treated like children … investors know that the stock market is a risky business and that when a company's officer makes predictions … they are not issuing guarantees."[134]

■ Nonetheless, plaintiffs argue that defendants' statements were not accompanied by meaningful cautionary language because they did not "specifically warn[ ]" investors of VeraSun's liquidity problems.[135] Plaintiffs presumably rely on the proposition that "cautionary language that is misleading in light of historical fact cannot be meaningful," but plaintiffs fail to demonstrate that the relevant risk—VeraSun's inability to meet its ongoing financial obligations—had already transpired.[136] While plaintiffs' claims of a liquidity "crisis"[137] must be accepted as true for the purposes of this motion, plaintiffs offer "no suggestion that the factual assertions contained in any of [defendants'] statements were false when the statements were made."[138] They do not contest the veraci-

127. See, e.g., Pl. Opp. at 12 ("Plaintiffs do **not** claim that Defendants failed to inform investors of [VeraSun's] change in hedging strategy or the fact that it entered into accumulator contracts.").

128. Hammerstone NV, Inc. v. Hoffman, No. 09 Civ. 2685, 2010 WL 882887, at *7 (S.D.N.Y. Mar. 10, 2010).

129. In re Britannia Bulk Holdings Inc. Sec. Litig., 665 F.Supp.2d 404, 414 (S.D.N.Y. 2009).

130. Pl. Opp. at 12.

131. 1Q 2008 10–Q at 42–43.

132. In Re Sierra Wireless, Inc. Sec. Litig., 482 F.Supp.2d 365, 380 (S.D.N.Y.2007) (citations and quotations omitted) (noting that caution-ary language is meaningful if it has identified the allegedly undisclosed risk, and if the allegedly fraudulent materials—including the cautionary language—suggested the existence of the risk).

133. Compl. ¶ 4.

134. In re IAC/InterActiveCorp Sec. Litig., 478 F.Supp.2d 574, 587 (S.D.N.Y.2007) (citation omitted).

135. Pl. Opp. at 12.

136. Slayton II, 604 F.3d at 770.

137. Compl. ¶ 68.

138. In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 269 (2d Cir.1993) (noting that "expressions of opinion" and "projections" are not

ty of VeraSun's financial disclosures to the SEC, and acknowledge that VeraSun had "record revenues totaling more than $1 billion and significant earnings" in the financial quarter preceding its bankruptcy, as well as an available credit line of 85 million dollars in June 2008.[139] "It is well-established ... that defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy."[140]

 If anything, plaintiffs demonstrate only that the defendants knew that VeraSun's financial condition would likely deteriorate as the accumulator contracts and construction projects continued to necessitate more and more capital in a declining market. But the Second Circuit has explicitly deemed such a showing inadequate to overcome safe harbor protection on the grounds that it constitutes "a future projection that was not historical fact."[141] Indeed, "misguided optimism is not a cause of action, and does not support an inference of fraud."[142] The cautionary language invoked by defendants is not discredited by the contemporaneous existence of the risks to VeraSun's liquidity, because these risks were adequately acknowledged

and had not yet materialized to the extent that they would fraudulently undermine any positive predictions of the Company's performance.[143] Thus, defendants' use of the requisite cautionary language in their public disclosures effectively secures the protection of safe harbor for their forward-looking statements.[144]

## B. Puffery

 Even assuming, *arguendo*, that defendants' statements are not forward-looking, they remain non-actionable either as "accurate statements about past performance" or "expressions of puffery or corporate optimism."[145] Plaintiffs refute both characterizations, but the examples they proffer in support of their claim only serve to undermine it. For example, plaintiffs excerpt Herron's statement that "[t]he company continues to maintain a strong balance sheet," as proof that defendants issued a factual representation about VeraSun's liquidity. In its entirety, however, Herron's statement reads, "[t]he company continues to maintain a strong balance sheet with $154.4 million of cash and short-term investments at the end of

---

actionable absent a showing that they lacked some "basis of fact").

**139.** Compl. ¶ 2. *See also id.* ¶ 49.

**140.** *Pollio v. MF Global, Ltd.,* 608 F.Supp.2d 564, 571 (S.D.N.Y.2009) (quotation omitted).

**141.** *Slayton II,* 604 F.3d at 770 (noting the "high level of certainty" that has been present in cases in which courts have concluded that a cautionary statement misstated historical fact).

**142.** *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) ("We have rejected the legitimacy of alleging 'fraud by hindsight.' ").

**143.** *See, e.g., Pollio,* 608 F.Supp.2d at 571 ("[D]isclosure of accurate historical data does not become misleading even if less favorable

results might be predictable by the company in the future.") (citation omitted).

**144.** Because defendants prevail on the "meaningful cautionary language" prong of the safe harbor, I need not consider whether they had "actual knowledge" that their statements were false. Plaintiffs are incorrect that defendants *must* have both offered meaningful cautionary language *and* lacked actual knowledge belying their statements to secure safe harbor protection. *See Slayton II,* 604 F.3d at 766 ("The safe harbor is written in the disjunctive: that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false and misleading.").

**145.** *Rombach,* 355 F.3d at 174.

2007." [146] As established earlier, because Herron was speaking in the context of an earning conference call analyzing the financial quarter ending December 31, 2007, and was in fact summarizing VeraSun's undisputed SEC disclosures, his statement is appropriately grounded in accurate historical data.

▮▮▮ Moreover, it merely expresses his belief that the figures presented on the balance sheet indicate a favorable showing for the concluding quarter; it does not offer any of the "long-term guarantees" or specifics which would convert an opinion or projection into a factual misrepresentation.[147] Indeed, in the very same conversation—and in a statement plaintiffs also incorrectly offer as evidence that a puffery defense is inapplicable—Herron noted that "[b]ased on *current expectation[s]* . . . [w]e feel we will be in a position to fund those capital investments *for the year.*" [148] "Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" [149] Plaintiffs' other examples

similarly fail to demonstrate that defendants' statements are actionable as either factual representations, or alternately, as optimistic statements based on knowing falsehoods.

## 2. Scienter

To the extent that plaintiffs are able to identify a statement that is arguably neither forward-looking nor puffery from the voluminous record incorporated by reference in the Complaint, their 10(b) claim nonetheless independently fails for lack of scienter. Contrary to plaintiffs' contentions, a holistic assessment of the Complaint supports neither the motive and opportunity prong nor the recklessness prong of scienter.

### a. Motive and Opportunity

▮▮▮ Plaintiffs do not plead any individualized motive in respect to any defendant.[150] Instead, they argue in the aggregate that "Defendants were motivated to misrepresent VeraSun's liquidity to maintain the Company's stock price so that the Company could complete the offering announced on August 14, 2008." [151] "Conclusory statements of associations or generalized allegations of scienter against groups of defendants will not state a claim

---

**146.** Compl. ¶ 43.

**147.** *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107–08 (2d Cir.1998) (categorizing a statement as a prediction or opinion because it offered no guarantees and was clearly limited in temporal scope); *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994) (noting that opinions as to future events are not actionable absent a "relatively concrete representation" known to be false at the time when it is made, such as a statement made almost at the close of a company's fiscal year that their income would exceed the specific amount of $1,035,139 when actual performance during the prior eleven months made that impossible).

**148.** Compl. ¶ 83 (emphasis added); *see also* Pl. Opp. at 13.

**149.** *Rombach*, 355 F.3d at 174 (quoting *Shields*, 25 F.3d at 1129–30).

**150.** Plaintiffs argue in their Opposition Brief that Endres had a personal motive "to keep the Company afloat through at least September so he could sell his restricted stock," but fail to make any such allegation in the Complaint. Pl. Opp. at 22. Accordingly, I would not consider this allegation in deciding this Motion, even if it were sufficient to establish Endres' scienter, which it is not.

**151.** Pl. Opp. at 21.

for securities fraud." [152] In any event, "[m]otives that can be ascribed to virtually all corporate insiders, or any publicly owned, for profit endeavor are not sufficient to support a claim of fraud." [153] Such generalized motives include "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." [154] Because plaintiffs allege no specific benefit to each individual defendant stemming from the alleged fraud, they cannot establish scienter under the motive and opportunity prong.

### b. Conscious Misbehavior or Recklessness

 The Complaint also fails to allege facts supporting a strong inference of "conscious misbehavior or recklessness," which is identified by "deliberate illegal behavior" or conduct that is "highly unrea-

sonable" and "an extreme departure from the standards of ordinary care." [155] Plaintiffs posit that defendants were aware of the extent of VeraSun's liquidity problems, even as they "publicly stated that VeraSun had sufficient cash to meet its financial obligations." [156] "In cases in which scienter is pled in part by alleging that the defendant 'knew facts or has access to information suggesting that their public statements were not accurate,' the scienter analysis is closely aligned with the analysis as to misleading statements." [157] Accordingly, the Court must determine first "whether plaintiff has pleaded facts demonstrating that the statement was false" and then, if so, whether the defendants "had access to information indicating that it was." [158] Here, even assuming that plaintiffs offer sufficient facts to indicate that defendants' statements were actually misleading,[159] plaintiffs' attempt to estab-

---

**152.** *Cohen v. Stevanovich,* 722 F.Supp.2d 416, 428, No. 09 Civ. 4003, 2010 WL 2670865, at *7 (S.D.N.Y. July 1, 2010) (citations omitted).

**153.** *In re Alstom SA Sec. Litig.,* 406 F.Supp.2d 433 (S.D.N.Y.2005).

**154.** *Kalnit,* 264 F.3d at 139.

**155.** *Novak,* 216 F.3d at 308 (quotation marks omitted).

**156.** Compl. ¶ 42.

**157.** *Alstom,* 406 F.Supp.2d at 456.

**158.** *Id.* My determination that the statements at issue are forward-looking mandates that plaintiffs plead "actual knowledge" in order to establish scienter. 15 U.S.C. § 78u–5(c)(1)(B). But because scienter is assessed here in order to address any isolated statements that are arguably neither forward-looking nor puffery, a showing of reckless disregard is adequate.

**159.** In sidestepping the first step of the inquiry and accepting that defendants' statements contained falsehoods, I am according plain-

tiffs significant latitude. Plaintiffs allege that defendants. misstated VeraSun's liquidity. The most concrete statement that they plead in support of this claim concerns VeraSun's prospective ability to meet its capital requirements for the next twelve months. *See* Compl. ¶ 92. Because VeraSun still had 167 million dollars in accounts receivable, 28 million dollars in cash, and an 85 million dollar credit line at the time defendants made their statement in their 2Q 2008 10–Q filing—and because Plaintiffs do not allege that these amounts would be insufficient to cover expenses for the next twelve months—there is no showing of falsity. *See* Compl. ¶ 49; 2Q 10–Q 2008. This finding is supported by plaintiffs' concession that VeraSun's "precarious cash position" was "greatly exacerbated" by the losses incurred by the accumulator contracts in *August* 2008. Compl. ¶ 8. While plaintiffs' categorization of VeraSun's "catastrophic liquidity crisis" is controlling for purposes of this motion, plaintiffs cannot establish scienter by conclusory allegations alone. *See Kelter v. Apex Equity Options Fund, LP,* No. 08 Civ. 2911, 2009 WL 2599607, at *4 (S.D.N.Y. Aug. 24, 2009) (quoting *ECA,* 553 F.3d at 196) ("Although courts normally draw reasonable inferences in the non-movant's favor, 'the PSLRA estab-

lish scienter necessarily fails at the second step of the Court's analysis.[160]

■■■ Taken collectively, the facts alleged provide a "plausible non-culpable explanations for the defendant's conduct" that is more compelling than the inference of fraudulent intent[161]—namely, the competing theory that VeraSun was ultimately felled by its own ambitions and hubris. Simply put, VeraSun attempted to realize its expansion plans in a declining and volatile market, and then exacerbated its imprudence by locking itself into accumulator contracts on a faulty presumption that corn prices would remain high. The statements of plaintiffs' confidential witnesses only indicate that defendants were attempting to save cash as the Crush Spread continued to narrow, not that defendants actively covered-up a crisis. In any event, "claims essentially grounded on corporate mismanagement do not adequately plead recklessness."[162]

Plaintiffs themselves demonstrate that their scienter claim is implausible. Belying their charge that "liquidity problems were becoming evident to the Defendants" in March and April 2008, and that VeraSun secured its 125 million dollar credit facility in May 2008 "in order to mask [these] growing liquidity problems," plaintiffs aver that VeraSun had record revenues for the very same quarter.[163] Indeed, they support the inference of fraud by noting that "[d]espite this apparent success ... the once 'rising star' in the renewable fuel industry was insolvent" by the end of October 2008.[164] Yet plaintiffs note that a significant portion of VeraSun's ultimate losses came in August, when corn prices decreased and the accumulator contracts consequently exacted severe penalties.[165] As such, plaintiffs give additional credence to the non-fraudulent inference arising from their pleadings: As plaintiffs themselves explain, ["i]n essence, VeraSun made a high stakes bet and lost, with devastating consequences."[166] Had the price of corn remained almost eight dollars a bushel—as could reasonably be predicted in light of the expected shortage following the poor weather conditions in the

---

lishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter.' ").

Moreover, there is no indication that defendants' statements were misleading by omission by failing to include a pertinent fact. As noted earlier, plaintiffs were aware that VeraSun was engaging in capital intensive expansion efforts during a time of extreme market volatility, and that the Crush Spread was significantly narrowing. Plaintiffs were also aware that the accumulator contracts posed an additional risk to the company's cash reserves. Investors did not lack for indicators that VeraSun's liquidity was potentially vulnerable, and the " 'total mix' of information" available to them would not be "significantly altered" by any additional disclosures by defendants absent the alleged fraud. *Time Warner*, 9 F.3d at 267–68 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

160. The deficiencies in plaintiffs' scienter pleadings are augmented by the increased burden the law imposes in the absence of motive. *See Kalnit*, 264 F.3d at 142 (noting that the "strength of [plaintiffs'] circumstantial allegations" regarding recklessness must be "correspondingly greater" when there is no showing of motive). Moreover, "[t]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file ... financial statements" with the SEC. *Rombach*, 355 F.3d at 176–77.

161. *Tellabs*, 551 U.S. at 310, 127 S.Ct. 2499.

162. *Avaya*, 564 F.3d at 267 n. 42.

163. Compl. ¶ 5.

164. *Id.* ¶ 2.

165. *See id.* ¶ 8.

166. *Id.*

midwest—VeraSun would have made money. Because plaintiffs do not plead facts that give rise to an equally compelling competing inference of fraud, they fail to allege scienter.[167]

### C. Section 20(a) Control Person Liability

Plaintiffs' Section 20(a) claims are based on the defendants' control of VeraSun, and do not allege any other primary violations of the securities law against the defendants. Because plaintiffs' Section 10(b) claims have been dismissed, the Section 20(a) claims must also be dismissed.[168]

### D. Leave to Replead

■ Although leave to replead is typically granted, repleading should not be permitted when amendment would be futile. Here, plaintiffs may be able to allege new facts that provide a factual basis for attributing motive and opportunity to individual defendants, or otherwise supporting an inference of scienter. Plaintiffs may also allege other misstatements that have not yet been introduced into the record, and which may fall outside the protection of the safe harbor. Because amendment to plaintiffs' claims would not be futile, I grant them leave to replead their claims in their entirety.

## V. CONCLUSION

For the reasons discussed above, defendants' motion is granted in its entirety. All claims against defendants are dismissed without prejudice and with leave to amend. Any amended complaint must be filed within thirty (30) days of the date of this Order. The Clerk of the Court is directed to close this motion (Docket No. 30).

SO ORDERED.

---

**167.** Because plaintiffs have failed to allege adequate grounds for fraud even with regard to statements not protected by the safe harbor (assuming there are any), I need not address either loss causation or reliance.

**168.** *See Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (noting that plaintiffs must demonstrate "a primary violation by a controlled person" in order to establish a prima facie case of liability).